# EXHIBIT "A"

# MAJOR LEAGUE
# UNIFORM PLAYER'S CONTRACT

**Parties**

Between **Pittsburgh Associates** , herein called the Club,

and **Felipe Javier Rivero**

of █████████████████ , herein called the Player.

**Recital**

The Club is, along with other Major League Clubs, signatory to the Major League Constitution and has subscribed to the Major League Rules.

**Agreement**

In consideration of the facts above recited and of the promises of each to the other, the parties agree as follows:

**Employment**

1. The Club hereby employs the Player to render, and the Player agrees to render, skilled services as a baseball player during the year(s) **See Special Covenants** including the Club's training season, the Club's exhibition games, the Club's playing season, the Wild Card Game, the Division Series, the League Championship Series and the World Series (or any other official series in which the Club may participate and in any receipts of which the Player may be entitled to share).

**Payment**

2. For performance of the Player's services and promises hereunder the Club will pay the Player the sum of **See Special Covenants** in semimonthly installments after the commencement of the championship season(s) covered by this contract except as the schedule of payments may be modified by a special covenant. Payment shall be made on the day the amount becomes due, regardless of whether the Club is "home" or "abroad." If a monthly rate of payment is stipulated above, it shall begin with the commencement of the championship season (or such subsequent date as the Player's services may commence) and end with the termination of the championship season and shall be payable in semi-monthly installments as above provided.

Nothing herein shall interfere with the right of the Club and the Player by special covenant herein to mutually agree upon a method of payment whereby part of the Player's salary for the above year can be deferred to subsequent years. The Club shall be permitted to deduct from the Player's salary only those amounts that are specifically authorized by the Basic Agreement, this contract, any mutually agreed upon special covenant hereto, or a separate authorization signed by the Player. Any special covenant for a deduction from the Player's salary must state with specificity the particular expense for which the deduction is authorized. All deductions from a Player's salary must be identified on the Player's paystub and, if necessary, a separate document.

If the Player is in the service of the Club for part of the championship season only, he shall receive such proportion of the sum above mentioned, as the number of days of his actual employment in the championship season bears to the number of days in the championship season. Notwithstanding the rate of payment stipulated above, the minimum rate of payment to the Player for each day of service on a Major League Club shall be at the applicable rate set forth in Article VI(A)(1) of the Basic Agreement between the Thirty Major League Clubs and the Major League Baseball Players Association, effective December 1, 2016 ("Basic Agreement"). The minimum rate of payment for Minor League service for all Players (a) signing a second Major League contract (not covering the same season as any such Player's initial Major League contract) or a subsequent Major League contract, or (b) having at least one day of Major League service, shall be at the applicable rate set forth in Article VI(A)(2) of the Basic Agreement. The minimum rate of payment for Minor League service for all Players signing a first Major League contract who are not covered by Article VI(A)(2) of the Basic Agreement shall be at the applicable rate set forth in Article VI(A)(3) of the Basic Agreement.

Payment to the Player at the rate stipulated above shall be continued throughout any period in which a Player is required to attend a regularly scheduled military encampment of the Reserve of the Armed Forces or of the National Guard during the championship season.

**Loyalty**

3.(a) The Player agrees to perform his services hereunder diligently and faithfully, to keep himself in first-class physical condition and to obey the Club's training rules, and pledges himself to the American public and to the Club to conform to high standards of personal conduct, fair play and good sportsmanship.

**Baseball Promotion**

3.(b) In addition to his services in connection with the actual playing of baseball, the Player agrees to cooperate with the Club and participate in any and all reasonable promotional activities of the Club and Major League Baseball, which, in the opinion of the Club, will promote the welfare of the Club or professional baseball, and to observe and comply with all reasonable requirements of the Club respecting conduct and service of its team and its players, at all times whether on or off the field.

**Pictures and Public Appearances**

3.(c) The Player agrees that his picture may be taken for still photographs, motion pictures or television at such times as the Club may designate and agrees that all rights in such pictures shall belong to the Club and may be used by the Club for publicity purposes in any manner it desires. The Player further agrees that during the playing season he will not make public appearances, participate in radio or television programs or permit his picture to be taken or write or sponsor newspaper or magazine articles or sponsor commercial products without the written consent of the Club, which shall not be withheld except in the reasonable interests of the Club or professional baseball.

## PLAYER REPRESENTATIONS

### Ability

4.(a) The Player represents and agrees that he has exceptional and unique skill and ability as a baseball player; that his services to be rendered hereunder are of a special, unusual and extraordinary character which gives them peculiar value which cannot be reasonably or adequately compensated for in damages at law, and that the Player's breach of this contract will cause the Club great and irreparable injury and damage. The Player agrees that, in addition to other remedies, the Club shall be entitled to injunctive and other equitable relief to prevent a breach of this contract by the Player, including, among others, the right to enjoin the Player from playing baseball for any other person or organization during the term of his contract.

### Condition

4.(b) The Player represents that he has no physical or mental defects known to him and unknown to the appropriate representative of the Club which would prevent or impair performance of his services.

### Interest in Club

4.(c) The Player represents that he does not, directly or indirectly, own stock or have any financial interest in the ownership or earnings of any Major League Club, except as hereinafter expressly set forth, and covenants that he will not hereafter, while connected with any Major League Club, acquire or hold any such stock or interest except in accordance with Major League Rule 20(e).

### Service

5.(a) The Player agrees that, while under contract, and prior to expiration of the Club's right to renew this contract, he will not play baseball otherwise than for the Club, except that the Player may participate in post-season games under the conditions prescribed in the Major League Rules. Major League Rule 18(b) is set forth herein.

### Other Sports

5.(b) The Player and the Club recognize and agree that the Player's participation in certain other sports may impair or destroy his ability and skill as a baseball player. Accordingly, the Player agrees that he will not engage in professional boxing or wrestling; and that, except with the written consent of the Club, he will not engage in skiing, auto racing, motorcycle racing, sky diving, or in any game or exhibition of football, soccer, professional league basketball, ice hockey or other sport involving a substantial risk of personal injury.

### Assignment

6.(a) The Player agrees that his contract may be assigned by the Club (and reassigned by any assignee Club) to any other Club in accordance with the Major League Rules. The Club and the Player may, without obtaining special approval, agree by special covenant to limit or eliminate the right of the Club to assign this contract.

### Medical Information

6.(b) The Player agrees:

(1) that the Club's physician and any other physician or medical professional consulted by the Player pursuant to Regulation 2 of this contract or Article XIII(D) of the Basic Agreement may furnish to the Club all relevant medical information relating to the Player. Except as permitted by Article XIII(G) of the Basic Agreement, which is incorporated herein by reference, the Club is prohibited from re-disclosing any such information without the express written consent of the Player. The Club's physician shall be the custodian of the medical records furnished to a Club pursuant to this Paragraph 6(b). The Club's trainers shall have access to all such records provided to the Club.

(2) that, should the Club contemplate an assignment of this contract to another Club or Clubs, the Club's physician may furnish to the physicians and officials of such other Club or Clubs all relevant medical information relating to the Player; provided, however, that said physicians and officials are prohibited from re-disclosing any such information without the express written consent of the Player. In addition, within thirty (30) days from the receipt of the Player's medical information, the physicians and officials of the Club which requested the medical information will return any and all documents received to the Player's Club, and will not keep copies of any documents it received or any other records indicating the substance of the medical information transmitted. If the Player's UPC is assigned before the information is returned in accordance with this subparagraph (2), the assignee Club may retain the information. A Player may, at the time that he is no longer under reserve to the Club or on December 1 of every other year, whichever is earlier, request that the Club notify him of the Clubs to which his medical information was provided pursuant to this Paragraph 6(b)(2).

### No Salary Reduction

6.(c) The amount stated in paragraph 2 and in special covenants hereof which is payable to the Player for the period stated in paragraph 1 hereof shall not be diminished by any such assignment, except for failure to report as provided in the next subparagraph (d).

### Reporting

6.(d) The Player shall report to the assignee Club promptly (as provided in the Regulations) upon receipt of written notice from the Club of the assignment of this contract. If the Player fails to so report, he shall not be entitled to any payment for the period from the date he receives written notice of assignment until he reports to the assignee Club.

### Obligations of Assignor and Assignee Clubs

6.(e) Upon and after such assignment, all rights and obligations of the assignor Club hereunder shall become the rights and obligations of the assignee Club; provided, however, that

(1) The assignee Club shall be liable to the Player for payments accruing from the date of assignment and shall not be liable (but the assignor Club shall remain liable) for payments accrued prior to and including that date.

(2) If at any time the assignee is a Major League Club, it shall be liable to pay the Player at the full rate stipulated in paragraph 2 hereof for the remainder of the period stated in paragraph 1 hereof and all prior assignors and assignees shall be relieved of liability for any payment for such period.

(3) Unless the assignor and assignee Clubs agree otherwise, if the assignee Club is a Minor League Baseball Club, the assignee Club shall be liable only to pay the Player at the rate usually paid by said assignee Club to other Players of similar skill and ability in its classification and the assignor Club shall be liable to pay the difference for the remainder of the period stated in paragraph 1 hereof between an amount computed at the rate stipulated in paragraph 2 hereof and the amount so payable by the assignee Club.

(4) If performance and/or award bonuses are included as Special Covenants hereunder and an assignment is made during the championship season, the responsibility for such bonuses shall be as follows:

(i) All performance and/or award bonuses earned prior to the assignment shall be the responsibility of the assignor Club;

(ii) The responsibility for any and all performance bonuses earned after the assignment shall be prorated between the assignor and assignee Clubs in proportion to the total number of relevant events attained during the season with each Club involved; and

(iii) The responsibility for any and all award bonuses earned after the assignment shall be the full and exclusive responsibility of the Club for whom the Player was performing services at the end of the championship season. For purposes of this paragraph, an award bonus for election or selection to the All-Star Game shall be deemed to be earned on the day of the announcement of the election or selection, an award bonus for performance over the championship season shall be deemed earned on the last day of the championship season and an award bonus for performance in the post season shall be deemed earned on the day of the announcement of the award.

**Moving Allowances**

6.(f) The Player shall be entitled to moving allowances under the circumstances and in the amounts set forth in Articles VII(E) and VIII of the Basic Agreement.

**"Club"**

6.(g) All references in other paragraphs of this contract to "the Club" shall be deemed to mean and include any assignee of this contract.

**TERMINATION**

**By Player**

7.(a) The Player may terminate this contract, upon written notice to the Club, if the Club shall default in the payments to the Player provided for in paragraph 2 hereof or shall fail to perform any other obligation agreed to be performed by the Club hereunder and if the Club shall fail to remedy such default within ten (10) days after the receipt by the Club of written notice of such default. The Player may also terminate this contract as provided in subparagraph (d)(4) of this paragraph 7. (See Article XV(J) of the Basic Agreement.)

**By Club**

7.(b) The Club may terminate this contract upon written notice to the Player (but only after requesting and obtaining waivers of this contract from all other Major League Clubs) if the Player shall at any time:

(1) fail, refuse or neglect to conform his personal conduct to the standards of good citizenship and good sportsmanship or to keep himself in first-class physical condition or to obey the Club's training rules; or

(2) fail, in the opinion of the Club's management, to exhibit sufficient skill or competitive ability to qualify or continue as a member of the Club's team; or

(3) fail, refuse or neglect to render his services hereunder or in any other manner materially breach this contract.

7.(c) If this contract is terminated by the Club, the Player shall be entitled to termination pay under the circumstances and in the amounts set forth in Article IX of the Basic Agreement. In addition, the Player shall be entitled to receive an amount equal to the reasonable traveling expenses of the Player, including first-class jet air fare and meals en route, to his home city.

**Procedure**

7.(d) If the Club proposes to terminate this contract in accordance with subparagraph (b) of this paragraph 7, the procedure shall be as follows:

(1) The Club shall request waivers from all other Major League Clubs. Such waivers shall be good for the periods specified in Major League Rule 10. Such waiver request must state that it is for the purpose of terminating this contract and it may not be withdrawn.

(2) Upon receipt of waiver request, any other Major League Club may claim assignment of this contract at a waiver price of $1.00, the priority of claims to be determined in accordance with the Major League Rules.

(3) If this contract is so claimed, the Club shall, promptly and before any assignment, notify the Player that it had requested waivers for the purpose of terminating this contract and that the contract had been claimed.

(4) Within five (5) days after receipt of notice of such claim, the Player shall be entitled, by written notice to the Club, to terminate this contract on the date of his notice of termination. If the Player fails to so notify the Club, this contract shall be assigned to the claiming Club.

(5) If the contract is not claimed, the Club shall promptly deliver written notice of termination to the Player at the expiration of the waiver period.

7.(e) Upon any termination of this contract by the Player, all obligations of both Parties hereunder shall cease on the date of termination, except the obligation of the Club to pay the Player's compensation to said date.

**Regulations**

8. The Player accepts as part of this contract the Regulations set forth herein.

**Rules**

9.(a) The Club and the Player agree to accept, abide by and comply with all provisions of the Major League Constitution, and the Major League Rules, or other rules or regulations in effect on the date of this Uniform Player's Contract, which are not inconsistent with the provisions of this contract or the provisions of any agreement between the Major League Clubs and the Major League Baseball Players Association, provided that the Club, together with the other Major League Clubs and Minor League Baseball, reserves the right to modify, supplement or repeal any provision of said Constitution, Major League Rules or other rules and regulations in a manner not inconsistent with this contract or the provisions of any then existing agreement between the Major League Clubs and the Major League Baseball Players Association.

**Disputes**

9.(b) All disputes between the Player and the Club which are covered by the Grievance Procedure as set forth in the Basic Agreement shall be resolved in accordance with such Grievance Procedure.

**Publication**

9.(c) The Club, the Chief Baseball Officer and the Commissioner, or any of them, may make public the findings, decision and record of any inquiry, investigation or hearing held or conducted, including in such record all evidence or information given, received, or obtained in connection therewith.

**Renewal**

10.(a) Unless the Player has exercised his right to become a free agent as set forth in the Basic Agreement, the Club may retain reservation rights over the Player by instructing the Office of the Commissioner to tender to the Player a contract for the term of the next year by including the Player on the Central Tender Letter that the Office of the Commissioner submits to the Players Association on or before December 2 (or, if December 2 is a Saturday or Sunday, then on or before the preceding business day) in the year of the last playing season covered by this contract. (See Article XX(A) and Attachments 9 and 12 to the Basic Agreement.) If prior to the March 1 next succeeding said December 2, the Player and the Club have not agreed upon the terms of such contract, then on or before ten (10) days after said March 1, the Club shall have the right by written notice to the Player at his address

Rivero

following his signature hereto, or if none be given, then at his last address of record with the Club, to renew this contract for the period of one year on the same terms, except that the amount payable to the Player shall be such as the Club shall fix in said notice; provided, however, that said amount, if fixed by a Major League Club, shall be in an amount payable at a rate not less than as specified in Article VI, Section B, of the Basic Agreement. Subject to the Player's rights as set forth in the Basic Agreement, the Club may renew this contract from year to year.

10.(b) The Club's right to renew this contract, as provided in subparagraph (a) of this paragraph 10, and the promise of the Player not to play otherwise than with the Club have been taken into consideration in determining the amount payable under paragraph 2 hereof.

**Governmental Regulation-National Emergency**

11. This contract is subject to federal or state legislation, regulations, executive or other official orders or other governmental action, now or hereafter in effect respecting military, naval, air or other governmental service, which may directly or indirectly affect the Player, Club or the League and subject also to the right of the Commissioner to suspend the operation of this contract during any national emergency during which Major League Baseball is not played.

**Commissioner**

12. The term "Commissioner" wherever used in this contract shall be deemed to mean the Commissioner designated under the Major League Constitution, or in the case of a vacancy in the office of Commissioner, the Executive Council or such other body or person or persons as shall be designated in the Major League Constitution to exercise the powers and duties of the Commissioner during such vacancy.

**Supplemental Agreements**

The Club and the Player covenant that this contract, the Basic Agreement, the Agreement Re Major League Baseball Players Benefit Plan and Major League Baseball's Joint Drug Prevention and Treatment Program and applicable supplements thereto fully set forth all understandings and agreements between them, and agree that no other understandings or agreements, whether heretofore or hereafter made, shall be valid, recognizable, or of any effect whatsoever, unless expressly set forth in a new or supplemental contract executed by the Player and the Club (acting by its President or such other officer as shall have been thereunto duly authorized by the President or Board of Directors as evidenced by a certificate filed of record with the Commissioner) and complying with the Major League Rules.

Rivero

**Special Covenants**

## I.   Term

This Contract shall cover the following Championship Seasons:

2018 - 2021

and this Contract shall have an Option for the following Championship Season(s):

2022, 2023

## II.   Compensation And Payment Schedule

Major League Salary

In accordance with Paragraph 2 of the Uniform Player's Contract, for each day of service while in the Major Leagues, Club shall pay the Player a salary (less applicable withholding taxes and other normal payroll reductions and any other amounts required by law to be withheld), at a rate and for the season(s) indicated below in the following manner:

| Year | Salary |
|------|--------|
| 2018 | $2,500,000 |
| 2019 | $4,000,000 |
| 2020 | $5,250,000 |
| 2021 | $7,250,000 |

For 2022, there will be a Club Option on the same terms and conditions as the previous years of this contract, with a base salary of $10,000,000 (Ten million and 00/100 dollars), as well as the award bonuses, if earned, as set forth in Paragraph V. The Club must exercise the Club Option on or before the third day following the conclusion of the 2021 World Series. If the Club declines the option by the third day following the conclusion of the 2021 World Series, the Club will pay Player a buyout of $1,000,000 (One million and 00/100 dollars) on or before December 1, 2021.

For 2023, there will be a Club Option on the same terms and conditions as the previous years of this contract, with a base salary of $10,000,000 (Ten million and 00/100 dollars), as well as the award bonuses, if earned, as set forth in Paragraph V. The Club must exercise the Club Option on or before the third day following the conclusion of the 2022 World Series. If the Club declines the option by the third day following the conclusion of the 2022 World Series, the Club will pay Player a buyout of $500,000 (Five hundred thousand and 00/100 dollars) on or before December 1, 2022.

## III.   Guarantee Provisions

**Multi-Year Termination Pay**

A. In the event Club terminates this Contract under paragraph 7(b)(2) hereof because Player fails, in the opinion of Club's management, to exhibit sufficient skill or competitive ability to qualify or continue as a member of Club's team, Player shall be entitled to receive termination pay from Club as required by Article IX ("Termination Pay") of the Basic Agreement, if the failure to exhibit sufficient skill or competitive ability is caused by one of the following:

1. Player's failure or inability to render his professional playing services to Club or failure to exhibit sufficient skill or competitive ability, including without limitation by reason of any death or long-term injury, physical impairment or mental incapacity, which occurs as a result of any of the following:

a. Player's self-inflicted injury, including without limitation intentionally striking any hard or other surface or person with any portion of the body, suicide or attempted suicide;

b. Player's injury sustained off the playing field as a result of battery or assault of, or by, another person by Player while engaged in a fight, brawl, or other violent act (e.g., kicking or punching any object), unless Player was acting in self-defense as determined by an applicable court;

c. Player's misuse or abuse of prescription or over-the-counter drugs not covered by Major League Baseball's Joint Drug Prevention and Treatment Program ("Program") or the misuse or abuse of alcohol or other chemical dependency, including but not limited to injury caused by his operation of a motor vehicle, boat or other means of transportation under the influence of alcohol or drugs (operating under the influence is defined under the law of the relevant jurisdiction relating to degrees of intoxication at the time of the incident), provided however to the extent a determination is required in this Subsection (c) as to "misuse or abuse," such determination will be made by a competent medical physician (a "Qualified Physician") acceptable to both Club and Player. If Club and Player are unable to agree on an acceptable physician within seven days after Club notifies Player of the applicable violation, then the determination will be the Qualified Physician Panel Determination. For purposes of this Contract, the "Qualified Physician Panel Determination" means Club and Player shall each select a physician and the two physicians will jointly designate a third physician; all three physicians will then participate in such determination and such determination will be the determination of at least two of the three physicians);

d. use, misuse, or abuse of any Prohibited Substance as defined in the Program;

Rivero

e. Player's participation in any of the following acts, activities or sports: any of the following games, acts, activities or sports, regardless of whether they are competitive or non-competitive, organized or impromptu: archery (including bow hunting), any sport involving the use of a firearm (e.g., hunting, trap, double trap, skeet, target or running target shooting, paintball, etc.), auto racing (including as a passenger, member of the pit crew or credentialed person with access greater than the general public), billiards, boccie, bowling, shuffleboard, cricket, croquet, darts, golf, motorcycle riding or racing, piloting of aircraft, hot air ballooning, parasailing, hang gliding, any form of horse racing or equestrian activity (e.g., polo, dressage, eventing, jumping, reining, steeplechase, combined driving, sulky driving, etc.), fencing, boxing, wrestling (e.g., freestyle, Greco-Roman, etc.), any form of martial arts (e.g., karate, judo, jujitsu, kung fu, tai chi chuan, tae kwon do, etc.), use of an All Terrain Vehicle, any form of extreme sport (e.g., adventure racing, bungee jumping, parachuting, skydiving, skysurfing, roller/in-line skating, skate boarding, mountainboarding, BMX, Motocross, sport climbing, mountain climbing, street luge, wake boarding, sandboarding, rockboarding, etc.), any form of timber or lumberjack sport (e.g., wood chopping, sawing, chain-sawing, log rolling, tree climbing, jigger, etc.), any form of winter sport (e.g., alpine skiing, Super G, cross-country skiing, winter biathlon, curling, snowmobiling, snow boarding, bobsledding, luge, skeleton, ice skating, figure skating, speed skating, nordic combined, dogsledding, etc.), any form of hockey or ice hockey, squash, spelunking, any form of gymnastics (e.g., pommel horse, rings, vault, parallel bars, uneven bars, horizontal bar, balance beam, floor, etc.), any form of track and field (e.g., sprints, distance running, hurdles, relays, steeplechase, marathon, race walks, long jump, triple jump, high jump, pole vault, shot put, discus, javelin, hammer throw, decathlon, pentathlon, etc., except in accordance with a regimen prescribed by Club's physician, trainer or strength and conditioning coach), biathlon, triathlon, organized or pick-up basketball, organized or pick-up football (touch, flag or tackle), any form of sailing, rowing, rafting, whitewater, rapid water or open sea canoeing or kayaking, any form of fishing, jai-alai, lacrosse, soccer, rodeo, bicycle racing (e.g., road, track, cyclo-cross, mountainbiking, etc., except in accordance with a regimen prescribed by Club's physician, trainer or strength and conditioning coach), motor boat racing, jet skiing, water skiing, speed boating, skin or scuba diving, snorkling, surfing, wind surfing, body surfing, scurfing, skim boarding, rugby, handball, volleyball, beach volleyball, paddleball or racquetball, tennis, table tennis, any form of pool or water sports including any form of swimming (e.g., freestyle, backstroke, breaststroke, butterfly, etc., except in accordance with a regimen prescribed by Club's physician, trainer or strength and conditioning coach), water polo or diving (e.g., springboard, high, platform, cliff diving, etc.), weight-lifting (except in accordance with a regimen approved by Club's physician, trainer or strength and conditioning coach), participation in the "Superteams" or "Superstars" activities or other on-line, television or motion picture athletic, dance or talent competitions, or other acts, activities or sports involving a reasonably foreseeable risk of personal injury, or playing in a baseball or softball game other than the Major League All-Star Game, Club's pre-season exhibition, regular season, League Division or League Championship, World Series games or World Baseball Classic games ("Prohibited Activities");

f. flying activities including as a passenger in a single-engine or propeller powered airplane or as a passenger in a private plane with an unlicensed pilot and/or for the amusement such as sightseeing or joyriding (e.g., US Navy "Blue Angels", US Air Force "Thunderbirds", etc.), provided being a passenger on a regularly scheduled commercial airline or private charter (either commercially available to the general public or cooperatively owned) used for travel shall be excluded from this covenant;

g. failure to exhibit sufficient skill or competitive ability following a criminal act by Player, including without limitation incapacity due to civil or criminal proceedings, incarceration or as a condition of probation, but excluding minor, non-alcohol/drug-related traffic violations, but only if Player is found guilty, including pursuant to a plea of nolo contendere or a similar plea, of such act by a recognized court of law;

h. Player's elective surgery, cosmetic surgery and/or other elective treatment not authorized by Club pursuant to Regulation 2 attached hereto, including but not limited to alternative or holistic therapies, any form of vision correction procedure including Radial Keratotomy (RK), Automated Lamellar Kerotaplasty (ALK), Photorefractive Keratectomy (PRK) and Laser Assisted in-SituKeratomileusis (LASIK), which Player has undertaken without prior written approval from Club;

i. any form of non-FDA approved, complementary, alternative or holistic medicine and/or therapies (including acupuncture, acupressure, herbal therapy, Chinese medicine, biofeedback and hypnotherapy), which Player has undertaken without prior written approval from Club;

j. Player's presence in a vehicle or boat operated by a person who the Player knows, or reasonably should know, was intoxicated and/or under the influence of alcohol or any type of Prohibited Substance. For purposes of this Contract, "intoxicated" and/or "under the influence" with respect to alcohol shall be defined as having a blood alcohol level equaling or exceeding the level at which there would be a legal presumption of intoxication or under the influence in the jurisdiction in which the accident occurred;

k. failure to exhibit sufficient skill or competitive ability following Player's failure or inability to take all steps necessary (which steps include, for the avoidance of doubt, without limitation, disclosing to Club all material facts and providing all material information which may impact any visa application or other request for permission to render services as a professional baseball player in the United States of America so Club may file a truthful and accurate application and take all steps necessary as a potential employer), after Club has filed an application and taken all steps necessary, to obtain all requisite authorizations to lawfully enter, remain and render services as a professional baseball player in the United States of America; or,

l. failure to exhibit sufficient skill or competitive ability following Player's voluntary retirement as an active Player or any failure or refusal to render his services hereunder.

2. Player's failure to exhibit sufficient skill or competitive ability as a result of any injury, physical impairment, mental incapacity or death, under any circumstance where Player failed to provide full cooperation in Club's efforts to obtain, maintain, transfer and/or renew a policy of temporary and total disability insurance, personal accident and sickness insurance and/or term life insurance with respect to Player during the term of this Contract and, if applicable, Club's efforts to pursue a claim under any such policy. Player's full cooperation hereunder shall include, but not be limited to:

a. Appearing at a location designated by Club (or its insurance carrier) for a physical examination (including an HIV test if required by the insurance carrier) at a time designated by Club, which can be within seventy-two hours of the execution of this Agreement, and submitting to subsequent physical examination(s) and/or other evaluation(s) requested by Club or its insurance carrier to obtain, maintain, transfer and/or renew any such insurance policy and/or to pursue a claim under any such policy;

Rivero

b. Authorizing Club, and Player's former Club(s), and the doctors who have treated or examined him while he was employed by such Club(s), to release to Club and/or its insurance carrier any and all medical records pertaining to Player for use in obtaining, maintaining, transferring and/or renewing any policy of temporary and total disability insurance, personal accident and sickness insurance and/or term life insurance with respect to Player and/or pursuing a claim under any such policy; and,

c. Signing any additional release(s) or authorization(s) necessary to effectuate the foregoing authorization during the entire term of this Contract.

d. Note: For the avoidance of doubt and without limiting any other rights or remedies under this Contract, if Player (i) refuses or fails to provide full cooperation as required by this Paragraph A(2), (ii) makes any misrepresentation or material omission in any information disclosed to the Club (or its insurance carrier) in connection with or related to fulfilling his obligations under this Paragraph A(2), or (iii) makes any misrepresentation or material omission in any information disclosed to the Club (or its insurance carrier) pursuant to this Paragraph A(2) that materially conflicts with information received by Club (or its insurance carrier), and any of the foregoing (i), (ii) or (iii) discloses any mental or physical condition which prevents the Club from obtaining, maintaining, transferring or renewing any policy of temporary and total disability insurance, personal accident and sickness insurance and/or term life insurance at standard rates with respect to Player during the term of this Contract (i.e., the rates that would have applied with respect to the Player had the foregoing (i), (ii) or (iii) not occurred) and/or pursuing a claim under any such policy, or which the Club's insurance carrier has notified the Club would relieve the carrier from liability under any such policy, and Club terminates this Contract under paragraph 7(b)(2) hereof, Player shall be entitled to receive termination pay from Club as required by Article IX of the Basic Agreement.

B. Notwithstanding anything to the contrary in Article IX ("Termination Pay") of the Basic Agreement, Club and Player agree if this Contract is terminated by Club under paragraph 7(b)(2) hereof for failure to exhibit sufficient skill or competitive ability, and such failure to exhibit sufficient skill or competitive ability was not caused by any of the events described in Section A above, Player shall be entitled to receive termination pay from Club in an amount equal to the unpaid balance of the full salary stipulated herein, including any unearned salary (but for the avoidance of doubt, not including bonuses or other amounts) attributable to years subsequent to the year of release, except as may be modified by application of any provision of this Special Covenant, including for example the non-duplication provision below.

C. Player and Club agree if Club terminates the Contract pursuant to paragraph 7(b)(1) or 7(b)(3) of the Contract, all obligations of both parties hereunder, including the obligation to make salary payments to Player, shall cease on the date of termination, except the obligation to pay any amounts (including bonuses) earned as of said date.

D. NON-DUPLICATION.

1. In the event the Contract is terminated and during its term Player signs a Uniform Player's Contract ("UPC") with any Major League Club or Clubs, including the club which released him, notwithstanding anything to the contrary in this Special Covenant, Club's total obligations to Player (including amounts deferred to later years, if any) in any year shall be reduced by the amounts Player earns during such year from any Club or Clubs, including, but not limited to, Minor League earnings under a UPC, any amounts deferred to later years, buyout payments relating to options for Player's services in later years, and bonuses.

2. In the event Player refuses to accept a reasonable UPC offered by a Major League Club other than the club which terminated and/or released him, or does not bargain in good faith and with due diligence in all circumstances with such clubs over a reasonable contract, Player shall forfeit the portion of salary and buyout which would not have been payable had he accepted such other reasonable UPC.

E. Suspension. For the avoidance of doubt, nothing in these Special Covenants shall limit or restrict the rights of Club or Player under the Basic Agreement, including Player and Club's rights with regard to players placed on the Restricted List, Disqualified List or Ineligible List as set forth in Major League Rule 15 or suspension by Club or by action of the Commissioner of Baseball. For the avoidance of doubt, Club is not obligated to pay Player's salary during the time of such suspension.

## IV.  Signing Bonus

In addition to the salary set forth in this contract, the Player shall receive a signing bonus as follows.

$2,000,000 (Two million and 00/100 dollars)

This signing bonus shall be deemed earned only upon Club's receipt of the approval of this Contract by the Office of the Commissioner of Baseball. This signing bonus shall be paid to the player within thirty (30) days after the Club's receipt of approval of this Contract by the Office of the Commissioner of Baseball; provided, however, that if the date of payment falls on a Saturday, Sunday or legal holiday, this signing bonus will be payable on the first business day following such Saturday, Sunday or legal holiday.

## V.  Award Bonuses

Player is to receive the following Award Bonuses, if earned on the Major League level during each Championship Season covered by this contract:

Reliever of the Year: $325,000 - 1st place; $150,000 - 2nd place; $100,000 - 3rd place
World Series MVP: $50,000
LCS MVP: $25,000

Rivero

DS MVP: $25,000
Rawlings Gold Glove Winner: $25,000
Selection or Election to annual Major League All-Star Game: $50,000

The maximum amount Player can earn under this provision is $500,000 in each season. The Award Bonuses earned herein, less applicable withholding taxes and other normal payroll deductions and any amounts required by law to be withheld, shall be paid on December 1st of the year the bonus is earned or 30 days after the completion of the World Series, whichever is later.

## VI. Additional Special Covenants

### Payroll Deduction

The Club and Player agree as follows: As a convenience for the Player, the Club will pay obligations incurred by the Player as listed below, and the Player authorizes the Club to make deductions from salary to reimburse the Club.
a)     Hotel charges over and above the room charge in the Club's hotels on all road trips, if it is impossible for the Player to pay such charges when checking out of the hotel;
b)     Any monies advanced to the Player by the Club;
c)     Any other items, such as airline tickets obtained by the Club as a convenience for the Player or a deposit for luggage issued by the Club to the Player, not specified herein which might be paid by the Club at the request of and on behalf of the Player.

### Reliance on Truthfulness.
Notwithstanding the foregoing or anything else in this Contract, Player and Club recognize and agree Club has entered this Contract, including without limitation the multi-year termination pay provision, based on Player's representation: (a) he is in first-class physical condition; (b) his first-class physical condition is not caused by, enhanced by or related to Player having used, abused or misused any Prohibited Substance as defined in the Program, unless such use was part of a medical, treatment or rehabilitation program properly prescribed by a physician with an applicable club's consent; (c) Player did not make any misrepresentations or material omissions about any physical or mental defects or conditions known to him and unknown to Club which would prevent or impair the performance of services; and (d) Player's full legal name is Felipe Javier Rivero and Player's date of birth is 07/05/1991. Both Club and Player acknowledge Club has relied on these representations in entering into this Contract and the Contract is contingent on the truthfulness of each of the foregoing statements.

Rivero

## Approval

This contract or any supplement hereto shall not be valid or effective unless and until approved by the Commissioner.

Signed in duplicate this **16th** day of __January__ , A.D. **2018**

_____
Felipe Javier Rivero                                        (Player)

Pittsburgh Associates
_____
                                                                        (Club)

_____
                                    (Home Address of Player)

By  _Neal Huntington_____
        Neal Huntington              (Authorized Signature)

Senior Vice President and General Manager
_____
                                                                        (Title)

FOR COMMISSIONER'S OFFICE USE ONLY

# Regulations

1. The Club's playing season for each year covered by this contract and all renewals hereof shall be as fixed by the Office of the Commissioner.

2. The Player, when requested by the Club, must submit to a complete physical examination at the expense of the Club, and if necessary to treatment by a physician, dentist, certified athletic trainer or other medical professional in good standing. Upon refusal of the Player to submit to a complete medical or dental examination, the Club may consider such refusal a violation of this regulation and may take such action as it deems advisable under Regulation 5 of this contract. Disability directly resulting from injury sustained in the course and within the scope of his employment under this contract shall not impair the right of the Player to receive his full salary for the period of such disability or for the season in which the injury was sustained (whichever period is shorter), together with the reasonable medical and hospital expenses incurred by reason of the injury and during the term of this contract or for a period of up to two years from the date of initial treatment for such injury, whichever period is longer, but only upon the express prerequisite conditions that (a) written notice of such injury, including the time, place, cause and nature of the injury, is served upon and received by the Club within twenty days of the sustaining of said injury and (b) the Club shall have the right to designate the health care facilities, physicians, dentists, certified athletic trainers or other medical professionals furnishing such medical and hospital services. Failure to give such notice shall not impair the rights of the Player, as herein set forth, if the Club has actual knowledge of such injury. All workmen's compensation payments received by the Player as compensation for loss of income for a specific period during which the Club is paying him in full, shall be paid over by the Player to the Club. Any other disability may be ground for suspending or terminating this contract.

3. The Club will furnish the Player with two complete uniforms, exclusive of shoes, unless the Club requires the Player to wear nonstandard shoes in which case the Club will furnish the shoes. The uniforms will be surrendered by the Player to the Club at the end of the season or upon termination of this contract.

4. The Player shall be entitled to expense allowances under the circumstances and in the amounts set forth in Article VII of the Basic Agreement.

5. For violation by the Player of any regulation or other provision of this contract, the Club may impose a reasonable fine and deduct the amount thereof from the Player's salary or may suspend the Player without salary for a reasonable period or both. Written notice of the fine or suspension or both and the reason thereof shall in every case be given to the Player and the Players Association. (See Article XII of the Basic Agreement.)

6. In order to enable the Player to fit himself for his duties under this contract, the Club may require the Player to report for practice at such places as the Club may designate and to participate in such exhibition contests as may be arranged by the Club, without any

other compensation than that herein elsewhere provided, for a period beginning not earlier than thirty-three (33) days prior to the start of the championship season; provided, however, that the Club may invite players to report at an earlier date on a voluntary basis in accordance with Article XIV of the Basic Agreement. The Club will pay the necessary traveling expenses, including the first-class jet air fare and meals en route of the Player from his home city to the training place of the Club, whether he be ordered to go there directly or by way of the home city of the Club. In the event of the failure of the Player to report for practice or to participate in the exhibition games, as required and provided for, he shall be required to get into playing condition to the satisfaction of the Club's team manager, and at the Player's own expense, before his salary shall commence.

7. In case of assignment of this contract, the Player shall report promptly to the assignee Club within 72 hours from the date he receives written notice from the Club of such assignment.

8. Upon signing this contract, the Player shall execute the enclosed Life Insurance Notice and Consent Form in connection with the Club's participation in the League-wide Player Life Insurance Program.

Post-Season Exhibition Games. Major League Rule 18(b) provides:

(b) EXHIBITION GAMES. No player shall participate in any exhibition game during the period between the close of the Major League championship season and the following training season, except that, with the consent of the player's Club and permission of the Commissioner, a player may participate in exhibition games for a period of not less than 30 days, such period to be designated annually by the Commissioner. Players who participate in barnstorming during this period cannot engage in any Winter League activities.

Player conduct, on and off the field, in connection with such postseason exhibition games shall be subject to the discipline of the Commissioner. The Commissioner shall not approve of more than three players of any one Club on the same team. The Commissioner shall not approve of more than three players from the joint membership of the World Series participants playing in the same game.

No player shall participate in any exhibition game with or against any team which, during the current season or within one year, has had any ineligible player or which is or has been during the current season or within one year, managed and controlled by an ineligible player or by any person who has listed an ineligible player under an assumed name or who otherwise has violated, or attempted to violate, any exhibition game contract; or with or against any team which, during said season or within one year, has played against teams containing such ineligible players, or so managed or controlled. Any player who participates in such a game in violation of this Rule 18 shall be fined not less than $50 nor more than $500, except that in no event shall such fine be less than the consideration received by such player for participating in such game.

# LIFE INSURANCE CONSENT FORM

1. Your Club intends to insure your life under the League-wide Player Life Insurance Policy (or any replacement thereof) and League Disaster Insurance Policy (or any replacement thereof), as well as the Club-purchased insurance policy or policies, if any, whose maximum amount of insurance coverage is referenced in the fourth bullet point in paragraph 2 below (if included in this consent) (collectively the "Policy")." The purpose of the Policy is to offset amounts that your Club may pay under your Uniform Player's Contract ("Player Contract") in the event of your death and/or to provide financial assistance to your Club, other affected Clubs or the Office of the Commissioner of Baseball for costs and damages to your Club, other affected Clubs or the Office of the Commissioner of Baseball that they may incur as a result of your death.

2. The maximum amount of life insurance coverage for which you may be insured at the time the Policy is issued will be equal to the sum of:

• Seven million dollars ($7,000,000), of which a minimum of four million ($4,000,000) will be provided to your Club and up to an additional three million ($3,000,000) to either your Club, other affected Clubs or the Office of the Commissioner of Baseball

• The Major League salary provided under your Player Contract, up to one million dollars ($1,000,000); *and* (if applicable)

• Seventy-five percent (75%) of the amount by which the Major League salary provided under your Player Contract exceeds one million dollars ($1,000,000), all of which will be provided to your Club

In no event will the amount for which your life is insured under the Policy ever exceed a maximum limit of Thirty-Seven Million dollars ($37,000,000). The amount of coverage that your Club purchases under the Policy may be reduced under certain circumstances in order to reflect (if applicable) other insurance coverage on your life. The amount of insurance coverage that your Club purchases under the Policy may decrease over time as the amount owed under your Player Contract is paid to you.

3. Your Club may purchase insurance coverage on you under the Policy before you and your Club sign your Player Contract. Your Club will do so only when and if there is an agreement in principle with you as to the terms of your Player Contract and such terms have been reported to, and confirmed by, the Office of the Commissioner of Baseball and the Major League   Baseball Players Association.

4.  The Policy may be in effect for the length of your Player Contract and may be in effect for periods that extend beyond the length of your Player Contract, including for periods after your employment with the Club has terminated. Each time you enter into a new or revised Player Contract, a new Policy may be purchased and you may be asked to sign a new consent form.

5. Your Club, other affected Clubs or the Office of the Commissioner of Baseball will be the beneficiaries of any life insurance proceeds payable under the Policy in the event of your death.

| Consent of Employee for Life Insurance Coverage |
|---|

**By signing below, I agree to, consent to, and understand the following:**

A. I may be insured under the Policy up to a maximum face amount equal to the sum of:

• Seven million dollars ($7,000,000), of which a minimum of four million ($4,000,000) will be provided to my Club and up to an additional three million ($3,000,000) to either my Club, other affected Clubs or the Office of the Commissioner of Baseball;

• The Major League salary provided under my Player Contract, up to one million dollars ($1,000,000); *and* (if applicable)

• Seventy-five percent (75%) of the amount by which the Major League salary provided under my Player Contract exceeds one million dollars ($1,000,000), all of which will be provided to my Club

B. The amount for which my life is insured under the Policy will never exceed a maximum limit of Thirty-Seven Million ($37,000,000). The amount of coverage may be reduced under certain circumstances in order to reflect (if applicable) other insurance coverage on my life. The amount of insurance coverage may decrease over time as the amount owed under my Player Contract is paid to me.

C. My Club (or a Trust established by my Club and other Major League Baseball clubs, the Office of the Commissioner of Baseball or a combination of Clubs) will be the owner of the Policy. My Club will be the beneficiary and, in an amount not exceeding three million dollars ($3,000,000), other affected Clubs and the Office of the Commissioner of Baseball may also be beneficiaries of the Policy.

D. The Policy may be in effect for the length of my Player Contract and may be in effect for periods that extend beyond the length of my Player

Rivero

Contract, including for periods after my employment with the Club has terminated. Each time I enter into a new or revised Player Contract, a new Policy may be purchased and I may be asked to sign a new consent form.

E. Neither my heirs nor I will receive any rights or benefits, including the payment of a death benefit, under the Policy. The death benefit under the Policy will be payable to my Club, or, in an amount not exceeding three million dollars ($3,000,000), may be payable to other affected Clubs or the Office of the Commissioner of Baseball. This consent has no effect on any other life insurance policies I hold or that any other person holds on my life.

| Proposed Insured (please complete) |
| --- |

Name (First, Middle Initial, Last):  Felipe J Rivero

Date of Birth: ████████

████████████████████

(Home address: street/city/state/zip)

_____          _____          ___  _____
        *Signature of Insured*                              *Print Name of Insured*                          *Date*

## NOTIFICACION Y CONSENTIMIENTO PARA SEGURO DE VIDA

1. Su Club tiene intención de asegurar su vida por medio de la Póliza de Seguro de Vida de Jugadores de Grandes Ligas (o cualquier póliza que la reemplace) y la Póliza de Seguro de Desastre de Grandes Ligas (o cualquier póliza que la reemplace), y una(s) póliza(s) de seguro de vida comprado(s) por su Club, cuya cantidad máxima está incluido como el cuarto sub-párrafo en sección dos, abajo (si está incluido en este documento) (juntos, la "Póliza"). La finalidad de la Póliza es contrarrestar la cantidad que el Club pudiera pagar de acuerdo a su Contrato Uniforme de Jugador ("Contrato de Jugador") en caso de que usted fallezca y/o para proporcionar asistencia financiera a su Club, u otro Clubes afectados, o a la Oficina del Comisionado de Béisbol que puedan incurrir como resultado en caso de que usted fallezca.

2. La cantidad máxima de seguro de vida por la que se le puede aseguraren el momento en que se expida la Póliza será iguala la suma de:

•   Siete millones de dólares ($7,000,000) de la cual al mínimo cuatro millones de dólares ($4,000,000) recibirá su Club, y adicionalmente hasta tres millones de dólares ($3,000,000) o a su Club, u otros Clubes afectados, o la Oficina del Comisionado de Béisbol;

•   El salario de las Grandes Ligas indicado en su Contrato de Jugador, hasta un millón de dólares($1,000,000); y (de ser el caso)

•   Setenta y cinco por ciento (75%) de la cantidad por la que su salario indicado en su Contrato de Jugador exceda de un millón de dólares($1,000,000), pagado a su Club

En ningún caso la cantidad de su seguro de vida según la Póliza excederá de un límite máximo de $37,000,000. La cantidad de cobertura que su Club compre según la Póliza podrá reducirse bajo ciertas circunstancias con el fin de reflejar (de ser el caso) otra cobertura de seguro sobre su vida. La cantidad de cobertura de seguro que su Club compre por medio de la Póliza se reducirá con el paso del tiempo, en la medida en que se le pague a usted la cantidad que se le debe según su Contrato de Jugador.

3. Su Club podrá comprar la cobertura de seguro antes de que usted y su Club firmen su Contrato de Jugador. Su Club lo hará solamente cuando, y si hay un acuerdo en principio con usted respecto a los términos de su Contrato de Jugador y si dichos términos han sido reportados y confirmados por la Oficina del Comisionado de Béisbol y la Asociación de Jugadores de Béisbol de las Grandes Ligas.

4. La Póliza puede ser válida por la duración de su Contrato de Jugador, y puede estar vigente durante periodos que se extienden más allá de la duración de su Contrato de Jugador, incluyendo por periodos después de que su empleo con el Club haya terminado. Cada vez que firme un Contrato de Jugador nuevo o revisado, se comprará una nueva Poliza y se le pedirá que firme un nuevo formulario de consentimiento.

5. Su Club, otro Clubes afectados o la Oficina del Comisionado de Béisbol será(n) beneficiario(s) de cualquier pago del seguro de vida pagadero según la Póliza en caso de que usted fallezca.

| Consentimiento del Empleado para la Cobertura del Seguro de Vida |
|---|

**Al firmar abajo, estoy de acuerdo, consiento y entiendo lo siguiente:**

A. Pudiera estar asegurado por una Póliza hasta una cantidad máxima equivalente a la suma de:

•   Siete millones de dólares ($7,000,000) de la cual al mínimo cuatro millones de dólares ($4,000,000) recibirá mi Club, y adicionalmente hasta tres millones de dólares ($3,000,000) o a mi Club, u otros Clubes afectados, o la Oficina del Comisionado de Béisbol;

•   El salario de las Grandes Ligas indicado en su Contrato de Jugador, hasta un millón de dólares($1,000,000); y (de ser el caso)

•   Setenta y cinco por ciento (75%) de la cantidad por la que su salario indicado en su Contrato de Jugador exceda de un millón de dólares($1,000,000), pagado a mi Club

B. En ningún caso la cantidad de mi seguro de vida excederá el límite máximo de $37,000,000. La cantidad de cobertura pudiera reducirse bajo ciertas circunstancias con el fin de reflejar (de ser el caso), otra cobertura de seguro sobre mi vida. La cantidad de cobertura del seguro disminuirá con el paso del tiempo en la medida en que se me pague la cantidad que se me debe de acuerdo a mi Contrato de Jugador.

C. Mi Club (o un Fideicomiso establecido por mi Club y otros clubes de Béisbol de las Grandes Ligas, la Oficina del Comisionado de Béisbol o un grupo de Clubes) será dueño de la Póliza. Mi Club será y en una cantidad que no exceda de tres millones de dólares ($3,000,000) otros Clubes afectados y la Oficina del Comisionado de Béisbol podrán ser beneficiarios de la Póliza.

D. La Póliza será válida por la duración de mi Contrato de Jugador, y puede estar vigente durante periodos que se extienden más allá de la

duración de mi Contrato de Jugador, incluyendo por períodos después de que mi empleo con el Club haya terminado. Cada vez que firme un Contrato de Jugador nuevo o revisado, se comprará una nueva Póliza y se me pedirá que firme un nuevo formulario de consentimiento.

E. Ni mis herederos ni yo recibiremos ningún derecho o beneficio, incluso el pago del beneficio por muerte, de acuerdo a la Póliza. Este beneficio por muerte de acuerdo a la Póliza será pagadero a mi Club, o en una cantidad que no exceda de tres millones de dólares ($3,000,000), podrá ser pagable a otros Clubes afectados o a la Oficina de Comisionado de Béisbol. Este consentimiento no tiene ningún efecto sobre ninguna otra Póliza de seguro de vida que yo tenga o que cualquier otra persona tenga sobre mi vida.

| Asegurado Propuesto (favor de completar) |
|---|

Nombre (Primero, Inicial Segundo, Apellido) Felipe J Rivero

Fecha de Nacimiento: ███████

███████████████

(Dirección de la casa: calle/ciudad/estado/zona postal)

| | | |
|---|---|---|
| _Firma del Asegurado_ | **Felipe J Rivero** | **1/16/2018** |
| | _Imprima el Nombre del Asegurado_ | _Fecha_ |

# EXHIBIT "B"

**DOCUMENTARY STAMPS IN THE AMOUNT REQUIRED BY LAW ARE BEING PAID ON THE AMOUNT REQUIRED BY FLORIDA LAW.**

## PROMISSORY NOTE
(Loan Number      5755)

**Date of Note:**        March 21, 2019 ("Effective Date")

**Amount of Note:**      $3,000,000.00 (U.S.)

**Maturity Date:**       October 1, 2021, unless accelerated or extended in accordance with the terms and conditions set forth in this Note.

FOR VALUE RECEIVED, the undersigned FELIPE VAZQUEZ, an individual ("Borrower"), having an address of                                                                                  does hereby covenant and promise to pay to the order of **CENTENNIAL BANK**, an Arkansas banking corporation, or its successors or assigns, ("Lender"), whose address is PO Box 966, Conway, Arkansas 72033, or at such other place as Lender may designate to Borrower in writing from time to time, in legal tender of the United States, **Three Million and 00/100 Dollars ($3,000,000.00)**, together with all accrued interest, which shall be due and payable upon the following terms and conditions contained in this Note and the Loan Agreement.

### A.    Interest Rate:

The interest rate for the entire term of the Promissory Note ("Note") shall be fixed at the rate of 6.25% per annum. The interest rates stated herein are subject to Borrower's strict compliance with its monetary and non-monetary obligations as set forth herein. Interest shall accrue and be paid on the actual number of calendar days elapsed from the date of each advance based on a 360 day year.

### B.    Term:

The Term of this Note is subject to the Major League Uniform Player's Contract ("MLB Contract") by and between the Borrower and Pittsburgh Associates (hereinafter referred to as the "Pirates") dated January 16, 2018. The term of the MLB Contract expires at the end of the 2021 Major League Baseball season, unless the Pirates exercise their team option to extend the term of the MLB Contract, but it also provides both the Pirates or any future contract holder (collectively referred to as the "Team") and Borrower, independently, the right to terminate the MLB Contract prior to the expiration date based on reasons set forth therein. The term of this Note shall mature on the earlier of: (1) October 1, 2021; or (2) if the MLB Contract is terminated, within five (5) calendar days after the Termination (as defined in the MLB Contract) is effective pursuant to the MLB Contract (the earlier of such dates in subsections (1) and (2) shall be deemed the "Maturity Date").

### C.    Repayment Terms:

1.    During the Term of the Note, Borrower shall make monthly payments on the Loan, payable in arrears, commencing with the first payment due on May 1, 2019, and each monthly payment due shall thereafter be paid on the 1st day of each consecutive month thereafter through the Maturity Date. The amount of each monthly payment, and the breakdown of the amounts applied toward principal and/or interest, is specifically set forth on the Loan Amortization Schedule attached as Exhibit

T J

"A" to this Note.  In particular, each monthly payment due is identified under the "Repayment Amount" category on Exhibit "A."

      2.    It is noted that the regularly scheduled monthly payments due on the 1st day of November through April each year, rather than paid during those months, shall be paid during the preceding 1st day of May through October, as stated under the "Repayment Amount" on Exhibit "A." Further, in addition to the monthly payments due under the "Repayment Amount" set forth on Exhibit "A," Borrower shall further be required to pay the amounts due for the insurance escrows, on the 1st day of each May through October, in the amounts identified under the "Insurance Escrow" category on Exhibit "A."

      3.    Notwithstanding, in the event the MLB Contract is Terminated prior to the final scheduled payment due October 1, 2021, pursuant to Section B(2) above, Borrower shall be required to make a final balloon payment to Lender in an amount equal to the remaining principal balance, plus all accrued interest and all other fees then due, within five (5) calendar days of the date of Termination. In the event the MLB Contract is not terminated prior to October 1, 2021 and the Maturity Date remains October 1, 2021, the entire remaining principal balance of this Note, plus all accrued but unpaid interest, shall be due and payable in full as a final payment on the Maturity Date.

      4.    All payments made hereunder shall be credited first to accrued interest on the unpaid balance, next to the payment of principal, then to late fees and other fees charged on the account, and lastly to the repayment of any monies paid by Lender for the protection of the collateral securing this Note; however, in the event any default hereunder, Lender may, at its sole discretion, and in such order as it may choose, apply any payment to interest, principal, protection of the collateral securing this Note and/or lawful charges and expenses then accrued.

**D.**    **Prepayment**:

    Borrower may prepay all or any portion of this Note at any time without penalty.

**E.**    **Security**:

    This Note is secured by the Secured Financial Transaction and Security Agreement between the parties executed of even date herewith.  The Lender is entitled to the benefit of this security.

**F.**    **Default and Default Interest Rate:**

    If any installment of principal or interest is not fully paid within five (5) days after the same become due and payable, or if any other monetary obligation due under this Note is not paid in full within five (5) days after same becomes due and payable; or if any non-monetary term, covenant, agreement or stipulation of this Note, the Mortgage or of any other instrument securing this Note is not promptly and fully performed within thirty (30) days after notice, or upon assigning for the benefit of creditors or the commencement of any bankruptcy, insolvency or reorganization proceedings, the entire indebtedness (including principal and accrued interest) remaining unpaid, shall, at the option of the Lender, become immediately due, payable and collectable, and while in default this Note and any deferred interest shall bear interest at the highest non-usurious rate permitted by the laws of the State of Florida ("Default Rate")  irrespective of any declaration of maturity or acceleration.

**G.**     **Late Charges**:

Lender may collect a late charge not to exceed an amount equal to five percent (5%) of any installment which is not paid within five (5) days of the due date thereof (except for the payment due on the Maturity Date for which there is no grace period), to cover the extra expense involved in handling delinquent payments, provided that collection of said late charge shall not be deemed a waiver by Lender of any of its rights under this Note.

**H**     **Acceleration**:

Should any default remain uncured after the expiration of all applicable grace periods in the payment as stipulated above of either the interest or principal, then and in that event, the principal of this Note or any unpaid part thereof and all accrued interest thereon shall, in the sole discretion of Lender, at once become due and payable and may be collected forthwith without notice to the undersigned, regardless of the stipulated date of maturity. However, Lender may, in the sole discretion of Lender, accept payments made by Borrower after any default has occurred, without waiving any of Lender's rights herein.

**I.**     **Costs**:

In the event that this Note is collected by law or through attorneys at law, or under advice therefrom (whether such attorneys are employees of Lender or an affiliate of Lender or are outside counsel), Borrower and any endorser, guarantor or other person primarily or secondarily liable for payment hereof hereby, severally and jointly agree to pay all costs of collection, including reasonable attorneys' fees including charges for paralegals and others working under the direction or supervision of Lender's attorneys, whether or not suit is brought, and whether incurred in connection with collection, trial, appeal, bankruptcy or other creditors' proceedings or otherwise.

**J.**     **Loan Charges**:

Nothing herein contained, nor any transaction related thereto, shall be construed or so operate as to require Borrower or any person liable for the repayment of same, to pay interest in an amount or at a rate greater than the maximum allowed by applicable law. Should any interest or other charges paid by Borrower, or any parties liable for the payment of the loan made pursuant to this Note, result in the computation or earning of interest in excess of the maximum legal rate of interest permitted under the law in effect while said interest is being earned, then any and all of that excess shall be and is waived by Lender, and all that excess shall be automatically credited against and in reduction of the principal balance, and any portion of the excess that exceeds the principal balance shall be paid by Lender to Borrower or any parties liable for the payment of the loan made pursuant to this Note so that under no circumstances shall the Borrower, or any parties liable for the payment of the loan hereunder, be required to pay interest in excess of the maximum rate allowed by applicable law.

**K.**     **Jurisdiction and Venue**:

The laws of the State of Florida shall govern the interpretation and enforcement of this Note. In the event that legal action is instituted to collect any amounts due under, or to enforce any provision of, this instrument, Borrower and any endorser, guarantor or other person primarily or secondarily liable for payment hereof consent to, and by execution hereof submit themselves to, the jurisdiction of the courts of the State of Florida, and, notwithstanding the place of residence of any of them or the

place of execution of this instrument, such litigation may be brought in or transferred to a court of competent jurisdiction in and for Broward County, Florida.

**L.      Right of Setoff:**

To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**M.      Miscellaneous:**

1.      Borrower agrees to direct payment from the Team (as defined above) to Lender for all payments due under this Note.

2.      It is agreed that the granting to Borrower or any other party of an extension or extensions of time for the payment of any sum or sums due under this Note or under the Mortgage or for the performance of any covenant or stipulation thereof or the taking of other or additional security shall not in any way release or affect the liability of Borrower under this Note or any of the Loan Documents.

3.      This Note may not be changed orally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

4.      All parties to this Note, whether Borrower, principal, surety, guarantor or endorser, hereby waive presentment for payment, demand, notice, protest, notice of protest and notice of dishonor.

5.      Anything herein to the contrary notwithstanding, the obligations of Borrower under this Note shall be subject to the limitation that payments of interest shall not be required to the extent that receipt of any such payment by Lender would be contrary to provisions of law applicable to Lender limiting the maximum rate of interest which may be charged or collected by Lender.

6.      Borrower acknowledges that Lender shall have no obligation whatsoever to renew, modify or extend this Note or to refinance the indebtedness under this Note upon the maturity thereof, except as specifically provided herein.

7.      Lender shall have the right to accept and apply to the outstanding balance of this Note any and all payments or partial payments received from Borrower after the due date therefore, whether this Note has been accelerated or not, without waiver of any of Lender's rights to continue to enforce the terms of this Note and to seek any and all remedies provided for herein or in any instrument securing the same, including, but not limited to, the right to foreclose on such security.

8.      The term "Borrower" as used herein, in every instance shall include the borrowers of this Note, and its heirs, executors, administrators, successors, legal representatives and assigns, and shall denote the singular and/or plural, the masculine and/or feminine, and natural and/or artificial persons whenever and wherever the context so requires or admits.

9.      ***TIME IS OF THE ESSENCE OF THIS NOTE***

**N.      Waiver of Jury Trial**:

BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER TO EXTEND TO BORROWER THE LOAN EVIDENCED BY THIS NOTE.

IN WITNESS WHEREOF, Borrower has duly executed this Promissory Note in the original principal sum of **$3,000,000.00** on the 21st day of March 2019.

BORROWER:

BY: _____

Felipe Vazquez, an individual

STATE OF _Florida_                         )
COUNTY OF _Osceola_                    ) :ss

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before me by Felipe Vazquez, an individual, who does freely and voluntarily under authority duly vested in him.  He is either _____ personally known to me or __X__ has produced _____FLORIDA DRIVER LICENSE_____ as identification.  **The notary is not an obligor under the Note.**

WITNESS by hand and official seal in the County and State last aforesaid this _21_ day of March 2019.

RICHARD J HEGLIN
Notary Public - State of Florida
Commission # GG 067183
My Comm. Expires Jan 31, 2021

_____
NOTARY PUBLIC
Print Name: _Richard J Heglin_
My Commission Expires: _1/31/2021_

## FLORIDA AGREEMENT TO WAIVE GARNISHMENT PROTECTION

Loan Number ███ 5755

**IF YOU PROVIDE MORE THAN ONE-HALF OF THE SUPPORT FOR A CHILD OR OTHER DEPENDENT, ALL OR PART OF YOUR INCOME IS EXEMPT FROM GARNISHMENT UNDER FLORIDA LAW.   YOU CAN WAIVE THIS PROTECTION ONLY BY SIGNING THIS DOCUMENT.   BY SIGNING BELOW, YOU AGREE TO WAIVE THE PROTECTION FROM GARNISHMENT.**

Borrower:

_____                    3/21/19
Felipe Vazquez, an individual                       Date


I have fully explained this document to the consumer.

Lender:

**Centennial Bank**


By _____                 3/25/19
Authorized Signor                                   Date

F.V

EXHIBIT "A" - LOAN AMORTIZATION SCHEDULE - FELIPE VAZQUEZ

Note 1:  *Scheduled Payment includes Principal plus Interest.*
Note 2.  *Repayment Amount includes Scheduled Payment plus Interest Reserve for the offseason during season*
Note 3.  *Total includes Repayment Amount plus Insurance Escrow and SureSports fees.*

| PMT NO | PAYMENT DATE | BEGINNING BALANCE | REPAYMENT AMOUNT | INTEREST RESERVE | SCHEDULED PAYMENT | PRINCIPAL | INTEREST | INSURANCE ESCROW | SURESPORTS FEE | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 5/1/2019 | $3,000,000.00 | $103,530.45 | $13,530.45 | $90,000.00 | $68,645.83 | $21,354.17 | $3,212.00 | $4,970.00 | $111,712.45 |
| 2 | 6/1/2019 | $2,931,354.17 | $103,530.45 | $13,530.45 | $90,000.00 | $74,223.61 | $15,776.39 | $3,212.00 | $4,970.00 | $111,712.45 |
| 3 | 7/1/2019 | $2,857,130.55 | $103,530.45 | $13,530.45 | $90,000.00 | $75,119.11 | $14,880.89 | $3,212.00 | $4,970.00 | $111,712.45 |
| 4 | 8/1/2019 | $2,782,011.44 | $103,530.45 | $13,530.45 | $90,000.00 | $75,027.37 | $14,972.63 | $3,212.00 | $4,970.00 | $111,712.45 |
| 5 | 9/1/2019 | $2,706,984.07 | $103,530.45 | $13,530.45 | $90,000.00 | $75,431.16 | $14,568.84 | $3,212.00 | $4,970.00 | $111,712.45 |
| 6 | 10/1/2019 | $2,631,552.91 | $103,530.45 | $13,530.45 | $90,000.00 | $76,294.00 | $13,706.00 | $3,212.00 | $4,970.00 | $111,712.45 |
| 7 | 11/1/2019 | $2,555,258.91 | $0.00 | $0.00 | $13,752.26 | $0.00 | $13,752.26 | $0.00 | $0.00 | $0.00 |
| 8 | 12/1/2019 | $2,555,258.91 | $0.00 | $0.00 | $13,308.64 | $0.00 | $13,308.64 | $0.00 | $0.00 | $0.00 |
| 9 | 1/1/2020 | $2,555,258.91 | $0.00 | $0.00 | $13,752.26 | $0.00 | $13,752.26 | $0.00 | $0.00 | $0.00 |
| 10 | 2/1/2020 | $2,555,258.91 | $0.00 | $0.00 | $13,752.26 | $0.00 | $13,752.26 | $0.00 | $0.00 | $0.00 |
| 11 | 3/1/2020 | $2,555,258.91 | $0.00 | $0.00 | $12,865.02 | $0.00 | $12,865.02 | $0.00 | $0.00 | $0.00 |
| 12 | 4/1/2020 | $2,555,258.91 | $0.00 | $0.00 | $13,752.26 | $0.00 | $13,752.26 | $0.00 | $0.00 | $0.00 |
| 13 | 5/1/2020 | $2,555,258.91 | $192,361.25 | $7,986.25 | $184,375.00 | $171,066.36 | $13,308.64 | $951.00 | $4,970.00 | $198,282.25 |
| 14 | 6/1/2020 | $2,384,192.55 | $192,361.25 | $7,986.25 | $184,375.00 | $171,543.41 | $12,831.59 | $951.00 | $4,970.00 | $198,282.25 |
| 15 | 7/1/2020 | $2,212,649.15 | $192,361.25 | $7,986.25 | $184,375.00 | $172,850.79 | $11,524.21 | $951.00 | $4,970.00 | $198,282.25 |
| 16 | 8/1/2020 | $2,039,798.36 | $192,361.25 | $7,986.25 | $184,375.00 | $173,396.92 | $10,978.08 | $951.00 | $4,970.00 | $198,282.25 |
| 17 | 9/1/2020 | $1,866,401.44 | $192,361.25 | $7,986.25 | $184,375.00 | $174,330.13 | $10,044.87 | $951.00 | $4,970.00 | $198,282.25 |
| 18 | 10/1/2020 | $1,692,071.31 | $192,361.25 | $7,986.25 | $184,375.00 | $175,562.13 | $8,812.87 | $951.00 | $4,970.00 | $198,282.25 |
| 19 | 11/1/2020 | $1,516,509.18 | $0.00 | $0.00 | $8,161.77 | $0.00 | $8,161.77 | $0.00 | $0.00 | $0.00 |
| 20 | 12/1/2020 | $1,516,509.18 | $0.00 | $0.00 | $7,898.49 | $0.00 | $7,898.49 | $0.00 | $0.00 | $0.00 |
| 21 | 1/1/2021 | $1,516,509.18 | $0.00 | $0.00 | $8,161.77 | $0.00 | $8,161.77 | $0.00 | $0.00 | $0.00 |
| 22 | 2/1/2021 | $1,516,509.18 | $0.00 | $0.00 | $8,161.77 | $0.00 | $8,161.77 | $0.00 | $0.00 | $0.00 |
| 23 | 3/1/2021 | $1,516,509.18 | $0.00 | $0.00 | $7,371.92 | $0.00 | $7,371.92 | $0.00 | $0.00 | $0.00 |
| 24 | 4/1/2021 | $1,516,509.18 | $0.00 | $0.00 | $8,161.77 | $0.00 | $8,161.77 | $0.00 | $0.00 | $0.00 |
| 25 | 5/1/2021 | $1,516,509.18 | $257,455.00 | $0.00 | $257,455.00 | $249,556.51 | $7,898.49 | $0.00 | $4,970.00 | $262,425.00 |
| 26 | 6/1/2021 | $1,266,952.67 | $257,455.00 | $0.00 | $257,455.00 | $250,636.33 | $6,818.67 | $0.00 | $4,970.00 | $262,425.00 |
| 27 | 7/1/2021 | $1,016,316.34 | $257,455.00 | $0.00 | $257,455.00 | $252,161.69 | $5,293.31 | $0.00 | $4,970.00 | $262,425.00 |
| 28 | 8/1/2021 | $764,154.65 | $257,455.00 | $0.00 | $257,455.00 | $253,342.36 | $4,112.64 | $0.00 | $4,970.00 | $262,425.00 |
| 29 | 9/1/2021 | $510,812.29 | $257,455.00 | $0.00 | $257,455.00 | $254,705.84 | $2,749.16 | $0.00 | $4,970.00 | $262,425.00 |
| 30 | 10/1/2021 | $256,106.45 | $257,455.00 | $0.00 | $257,455.00 | $256,121.11 | $1,333.89 | $0.00 | $4,970.00 | $262,425.00 |

F.V

# EXHIBIT "C"

## Secured Financial Transaction and Security Agreement
### (Centennial Bank Loan No. ████5755)

This Secured Financial Transaction and Security Agreement ("Agreement"), having an effective date of March 22, 2019 ("Effective Date"), is hereby entered into by and between **Felipe Vazquez**, who resides at ████████████████████ and his agents, successors in interest, heirs, executors, representatives, successors and assignors (hereinafter referred to collectively as "Borrower") and **Centennial Bank**, an Arkansas banking corporation, with a mailing address of P.O. Box 966, Conway, Arkansas 72033, and its representatives, successors and assignors (hereinafter referred to collectively as "Lender"), who hereby agree as follows:

### RECITALS

**WHEREAS,** simultaneous to the execution of this Agreement, Lender is providing a loan ("Loan") to Borrower in the principal amount of **$3,000,000.00** ("Loan Amount"), which is more specifically set forth in the Promissory Note ("Note") also entered on this same date and in the related loan documents (collectively "Loan Documents"). The repayment of the Loan Amount is identified in the repayment terms and schedule set forth in the Note (the "Repayment Amount"). The Note provides evidence of Borrower's indebtedness to Lender and his promise to pay to the Lender the Repayment Amount, in full, under the terms as set forth in this Agreement and the Note; and,

**WHEREAS,** in order to secure the Repayment Amount due to Lender, Borrower agrees to grant to the Lender a perfected security interest in those payments (including, wages, bonuses, all payments defined as "Compensation" in the Major League Uniform Player's Contract and any other payments due Borrower) set forth in: (a) that certain Major League Uniform Player's Contract ("MLB Contract") by and between the Borrower[1] and Pittsburgh Associates (hereinafter referred to as the "Pirates") dated January 16, 2018, and their representatives, successors and assigns, and (b) any other subsequent contract or arrangement pursuant to which the Borrower enters into respective of services performed by Borrower for playing professional baseball (together hereinafter referred to as the "Borrower Contract" or "Borrower's Contract"). These payments are referred to as the "Pledged Payments"; and,

**WHEREAS**, as a material condition of the Loan, during the term of the Loan, Borrower shall be required to have all of the Pledged Payments electronically deposited directly into a controlled deposit account opened with Lender for the benefit of Borrower, wherein such funds shall be used to pay the Lender its monthly payment due pursuant to the Note, including insurance escrows, and Borrower shall be responsible to maintain a minimum balance necessary to satisfy the monthly obligations each month during the term of the Note,

**WHEREAS**, to the extent of any inconsistency exists between the terms of this Agreement and the Note, the terms of this Agreement shall control.

**NOW, THEREFORE,** for value received, Borrower and Lender have entered into this Agreement in order to secure (a) the timely repayment of all sums due under the terms of the Note and this Agreement; (b) the performance of all of the Borrower's obligations set forth herein below and in the Note; and (c) the repayment of any and all other agreed-upon liabilities of Borrower to Lender, of any kind of nature, whether direct or indirect, arising by operation of law or otherwise, whether now existing or in the future.

---

[1] It is noted that the MLB Contract identifies Borrower as Felipe Javier Rivero, but pursuant to the Final Judgment of Change of Name (Adult) in Case No. 2018-DR-000341, issued by the Ninth Judicial Circuit in and for Osceola County, Florida dated March 26, 2018, Borrower legally changed his name to Felipe Vazquez as of that date.

## TERMS

### A. <u>SCHEDULE OF REPAYMENT.</u>

1. As set forth in the Note, Borrower shall make monthly payments on the Loan, payable in arrears, commencing with the first payment due on May 1, 2019, and each monthly payment due shall thereafter be paid on the 1st day of each consecutive month thereafter through the Maturity Date. The amount of each monthly payment, and the breakdown of the amounts applied toward principal and/or interest, is specifically set forth on the Loan Amortization Schedule attached as Exhibit "A" hereto, which is identical to Exhibit "A" to the Note.

2. It is noted that the regularly scheduled monthly payments due on the 1st day of November through April each year, rather than paid during those months, shall be paid during the preceding 1st day of May through October, as stated under the "Repayment Amount" on Exhibit "A."

3. Further, in addition to the monthly payments due under the "Repayment Amount" set forth on Exhibit "A," beginning with the first payment due May 1, 2019, Borrower shall further be required to pay the amounts due for the insurance escrows, on the 1st day of each May through October, in the amounts identified under the "Insurance Escrow" category on Exhibit "A."

4. Further, in addition to the monthly payments due under the "Repayment Amount" and "Insurance Escrow" set forth on Exhibit "A," beginning with the first payment due May 1, 2019, Borrower has instructed Lender to collect a fee due Sure Sports, LLC, which fees shall be remitted to Lender on the 1st day of each May through October, in the amounts identified under the "Suresports Fee" category on Exhibit "A," and upon Lender's receipt of these funds, Lender shall remit them directly to Sure Sports, LLC.

5. As set forth on Exhibit "A," the total monthly payments due Lender are identified under the last category titled "Total."

6. Notwithstanding anything contrary stated herein or in the Note, in the event the MLB Contract is Terminated prior to the final scheduled payment due October 1, 2021, Borrower shall be required to make a final balloon payment to Lender in an amount equal to the remaining principal balance, plus all accrued interest and all other fees then due, within five (5) calendar days of the date of the Termination as defined in the MLB Contract.  In the event the Maturity Date remains October 21, 2021, the entire remaining principal balance of this Note, plus all accrued but unpaid interest, shall be due and payable in full as a final payment on the Maturity Date.

7. All payments made pursuant to the Note shall be credited first to accrued interest on the unpaid balance, next to the payment of principal, then to late fees and other fees charged on the account, and lastly to the repayment of any monies paid by Lender for the protection of the collateral securing the Note; however, in the event any default in the Note or this Agreement, Lender may, at its sole discretion, and in such order as it may choose, apply any payment to interest, principal, protection of the collateral securing the Note and/or lawful charges and expenses then accrued.

### B. <u>BORROWER'S OBLIGATIONS UNDER THIS AGREEMENT</u>

1. As consideration for Lender extending the Loan to Borrower, Borrower shall pay to the Lender the fees and costs identified on the **Closing Statement** that is included in the Loan Documents, wherein said fees and costs shall be added to and reflected in the repayment amount set forth in this

Agreement.  Borrower agrees and acknowledges that the above fees are not and should not be construed to be interest for any purpose.

2.  At Closing, Lender shall receive from Borrower an interest reserve in the amount of $5,208.33, which is equal to 10 days of interest payments at the initial non-default interest rate.

3.  As a condition to the Lender disbursing to Borrower the proceeds of the Loan, Borrower agrees to authorize the Pirates or any future contract holder to electronically deposit into a designated account (the "designated account") the Pledged Payments that would otherwise be paid directly to Borrower by the Pirates, or any future contract holder, under the terms of the MLB Contract and/or Borrower's Contract, until such time that the Lender receives the full repayment amount agreed to by Borrower and as set forth under the terms of this agreement.  Such authorization shall be in the form of an "Automatic Payment Authorization Form" attached hereto and made a part hereof, and said payments shall be made no later than five (5) calendar days after each of the scheduled payment dates set forth on Exhibit "A."  Failure to timely make any of the required scheduled payments as set forth herein and in the Promissory Note shall be deemed an event of default.

4.  Borrower agrees to allow Lender to directly provide to the Pirates, or any future contract holder, Borrowers financial institution information and account and routing numbers, as well as any other relevant instructions for the designated account, so the Pirates may directly deposit the Pledged Payments in accordance with subparagraph 3, above.

5.  Borrower shall notify Lender, in writing, when there is any change in Borrower's health status that could affect the Borrower contract.

6.  Borrower shall immediately notify Lender if there is any change in the Borrower's contact information including, but not limited to, a change of address, telephone number, or email address.

7.  Borrower shall immediately notify Lender of a Termination of the MLB Contract within one (1) business day of Borrower receiving a Notice of Termination or one (1) business day of Borrower providing a Notice of Termination of the MLB Contract.  Borrower acknowledges his obligation to satisfy in full the remaining principal, interest and fees due pursuant to the Note within five (5) calendar days of a Termination of the MLB Contract if such termination occurs prior to the final scheduled payment due date of October 1, 2021.

8.  Borrower agrees to provide Lender with notice of any changes to the Borrower's contract within two (2) business days of such change, including, but not limited to, any notices of default, notices of retirement, changes in terms or any other changes, and during that same time period, shall provide Lender with a copy of any notice and/or revised or amended contract.

9.  Borrower agrees that the loan amount shall not be funded to Borrower unless and until Borrower executes and delivers to the Lender the Note and other Loan Documents required to be delivered to lender hereunder.

10. Lender shall be authorized and empowered to debit the designated account and any securities account by an automated clearinghouse (ACH) transaction, for the purpose of making the payments required under the promissory note in this agreement, including the regularly scheduled payments required under the promissory note and any other payments due or to become due here under the Note.

**C.  BORROWER'S REPRESENTATIONS AND WARRANTIES AND GRANTING OF A SECURITY INTEREST**

1.  Borrower warrants and represents that he owns all rights, title and interest in and to the Borrower Contract and is entitled to all of the benefits afforded to it and to the Borrower Contract, including, but not limited to, any and all payments to be made to Borrower thereunder and Borrower further acknowledges the Borrower is hereby granting a perfected security interest in the Pledged Payments in order to satisfy the repayment amount on the terms as set forth in this Agreement.

2.  Borrower warrants and represents that, in addition to the Loan from Lender, he has an existing loan from is seeking additional financing from Wilmington Savings Fund Society ("WSF"), which has a current balance of $1,300,840.00 ("WSF Loan").  The funds received from the Loan and the WSF Loan shall be used for Borrower's future investment opportunities.

3.  Borrower warrants and represents that the Loan and the WSF Loan are to be similarly structured so that the monthly payments due for each loan shall be paid directly by the Pirates or any other subsequent baseball team.

4.  With the exception of the WSF Loan, Borrower's Contract and Pledged Payments are free and clear of any liens, judgments and or security interests.

5.  Borrower warrants and represents that, with the exception of the WSF Loan, he has not entered into or granted, and will not enter into or grant during the term of this Loan, any security interest, and has not permitted the filing or attachment of any security interests, and will not permit the filing or attachment of any security interests during the term of the Loan, on or affecting any of the Collateral that, directly or indirectly, secures the repayment of Borrower's Loan and Promissory Note unless first approved in writing by Lender.

6.  Borrower warrants and represents that, subject to the WSF Loan, he has the unrestricted right to assign to the Lender any portion of the Borrower's Contract, including the Pledged Payments and Borrower has not previously assigned, sold or otherwise transferred any portion of the Borrower Contract to the pledged payments, in whole or in part, to any other party, including the granting of any liens and or judgments if applicable except as set forth in this Agreement.

7.  Borrower warrants and represents that he has a legal capacity and the mental competency to execute this Agreement and shall perform all obligations set forth within the terms of this agreement and that it is doing so voluntarily and of its own free will.

8.  Borrower warrants and represents that he is under no contractual obligations or other restrictions that are adverse to the Lender with regard to the terms of this Agreement, the Borrower's Contract, or the Pledged Payments.

9.  Borrower warrants and represents that the execution, delivery and performance of this Agreement, and the consummation of the transaction contemplated in this Agreement, does not violate any laws, rules, regulations, order, or other agreement or instrument.

10. Borrower warrants and represents that there are no bankruptcies or insolvency proceedings in progress or in prospect, either personally, or with regard to any entity owned, in whole or in part, that could affect the repayment amount or Lender's interest in the repayment amount.

11. Borrower warrants and represents that he is not subject to any legal proceeding that could in anyway adversely affect the terms of this Agreement or pledged payments, and or Borrower's right, title, or interest in the Borrower's Contract or the Pledged Payments. Borrower further warrants that the Borrower contract has not been and is not in jeopardy of being subject to a levy or any other type of adverse interest.

12. Borrower warrants and represents that the information Borrower has provided to the Lender prior to the execution of this Agreement is true, accurate, and complete. Borrower further acknowledges that the Lender has relied and will continue to rely on this information in acquiring, protecting and otherwise dealing with the terms of this agreement.

13. Borrower warrants and represents that he has not engaged in any acts or conduct or made any omissions that could potentially result in Lender receiving less than the full amount of the Repayment Amount and there are no other parties that hold a similar interest in the Borrower's Contract or the Pledged Payments except as set forth in this agreement.

14. Borrower warrants and represents that he has paid all federal state and local taxes or has made adequate and acceptable terms for any tax payment due with the appropriate tax agency responsible for excepting such payment.

15. Borrower warrants and represents that there are no outstanding tax liens or judgments against the Borrower, liens owed by them to any county, city or state government entity, or other liens owed to the United States government, or other person or entity for any social service or other benefit that Borrower has received and is obligated to pay, including but not limited to child support or alimony.

16. This Agreement constitutes Borrower's legal, valid and binding obligation and is legally enforceable in a court of law and that the agreement is binding upon Borrower, his successors and assigns.

## D. **BREACH BY BORROWER**

A Breach of this agreement shall occur, upon one or more of the following events:

1. Borrower makes a material misrepresentation or false statement in this Agreement or in any financial documentation provided to Lender.

2. Borrower voluntarily files for bankruptcy, or in involuntary bankruptcy is filed against him;

3. Borrower incurs any federal, state or other tax lien or judgment;

4. Borrower fails to stay current in any federal, state or other tax payment due;

5. Borrower or the pledged payments become the subject of a civil lien and or civil judgment;

6. Borrower becomes indebted to any present or former spouse for support, maintenance or similar obligations, or becomes indebted to any child or to a guardian of any child for any child support or similar payments;

7. Borrower is convicted of a felony involving a crime of fraud theft perjury or other moral turpitude;

8. Borrower engages in any other action or behavior that, in the sole opinion of the Lender, could create a default under the Borrower contract, or encumber the Pledged Payments; or

9. Borrower becomes in default or suffers a default under any provision of the Note or this Agreement.

## E.   MISCELLANEOUS PROVISIONS

1. **NOTWITHSTANDING ANYTHING TO THE CONTRARY ABOVE, IT SHALL BE AN IMMEDIATE DEFAULT OF THIS AGREEMENT, THE NOTE AND LOAN DOCUMENTS IF BORROWER, DIRECTLY OR INDIRECTLY, TAKES ANY ACTION, OR FAILS TO TAKE ANY ACTION, THAT RESULTS IN THE PLEDGED PAYMENTS BEING NO LONGER ELECTRONICALLY DEPOSITED DIRECTLY INTO THE DEPOSIT ACCOUNT REFERENCED HEREINABOVE AT ANYTIME PRIOR TO THE SATISFACTION OF THE FULL BALANCE DUE UNDER THE NOTE. UPON SUCH IMMEDIATE DEFAULT AS DESCRIBED HEREIN, LENDER SHALL HAVE THE RIGHT TO ACCELRATE THE FULL BALANCE DUE, EXECUTE ON THE BALANCE DUE, AND SHALL FURTHER HAVE THE RIGHT TO DISBURSE TO LENDER AND APPLY TOWARD THE LOAN BALANCE ALL AMOUNTS HELD IN THE DEPOSIT ACCOUNT.  NO NOTICE SHALL BE REQUIRED TO BE PROVIDED BY LENDER TO BORROWER UNDER SUCH IMMEDIATE DEFAULT.**

2. Borrower and Lender agree that, in addition to any other legal rights and remedies available to Lender for any breach by the Borrower, Lender shall be entitled to enforce Borrower's obligations hereunder by court injunction, or court ordered affirmative action, which injunction or ordered action they also serve to restrain a future breach of this Agreement if there are reasonable grounds to believe that such a breach is threatened.

3. If Borrower breaches this Agreement, Lender may terminate its obligations under this Agreement and shall immediately be entitled to the full payment of the repayment amount, plus interest calculated at the highest non-usurious rate permitted by the laws of the State of Florida.

4. In the event of any material change in the Borrower's Contract, including, but not limited to, the termination of the Borrower's Contract, any material violation by Borrower of the Borrower's Contract, the suspension of Borrower by Major League Baseball, the Pirates or any future contract holder, or the withholding of Borrower's Compensation as described in the MLB Contract, all payments under the Note and any payments due under this Agreement shall be immediately due and payable by the Borrower to Lender.

5. In the event of a breach by Borrower under this Agreement, Borrower shall pay to the Lender all fees, cost and expenses incurred by the lender, including Lender's reasonable attorney's fees, incurred by Lender to enforce the terms of this Agreement.

6. During the entire term of the Loan and the Promissory Note, Borrower shall be required to maintain a Death & Disgrace insurance policy naming Lender as the insured or primary beneficiary, with said policy being issued by an insurance company acceptable to Lender, with a policy limit in an amount no less than the then outstanding principal balance of the Note.  Borrower shall be required to provide Lender with written confirmation of such policy on an annual basis.  Borrower authorizes the Bank the right to automatically debit the Loan Account for all insurance premiums and related other charges associated with the Death & Disgrace insurance policy.  Borrower acknowledges that the Lender will collect payments from Borrower to hold in escrow for the Insurance premiums set forth herein, in the amounts stated under the "Insurance Escrow" category on Exhibit "A."

Borrower further acknowledges that the amounts shown in the "Insurance Escrow" category are only estimates, and if the insurance premiums are greater than the aggregate amount collected by Lender, Borrower shall be required to remit to Lender additional funds to satisfy the shortfall.

7.  During the entire term of the Loan, Borrower shall not be permitted to obtain unsecured debt exceeding $200,000.00 or secured debt exceeding $200,000.00 without the prior written consent of the Lender.

8.  On an annual basis, Borrower shall deliver to Lender his individual U.S. federal (and Canadian if it exists), along with any local, state and/or province income tax returns within 10 days of each said return being filed.  Additionally, should any extensions on filing these returns be sought, Borrower shall provide Lender a copy of any such signed extensions.

9.  Borrower hereby directs Lender to collect the fees Borrower owes Sure Sports, LLC ("SSL Fees") as identified on Exhibit "A" as an accommodation to Borrower, and Lender agrees to remit to Sure Sports, LLC the SSL Fees it receives from Borrower.  Should Borrower fail to remit said SSL Fees to Lender, Lender shall not be under any obligation to send any payments to Sure Sports, LLC. Should Lender receive any partial payments from Borrower, the payments shall first be applied toward accrued interest, then to principal, then to late fees, then to insurance escrows, then to any other fees advanced by Lender, and finally to Sure Sports, LLC for the SSL Fees.

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement effective on the 22nd day of March 2019.

**BORROWER:**

_____
Felipe Vazquez

STATE OF ___FLORIDA___
COUNTY OF ___Osceola___

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before me by Felipe Vazquez, who is: _____ either personally known to me or __X__ has produced ___FLORIDA DRIVER LICENSE___ as identification.

WITNESS by hand and official seal in the County and State last aforesaid this _21_ day of March 2019.

RICHARD J HEGLIN
Notary Public - State of Florida
Commission # GG 067183
My Comm. Expires Jan 31, 2021

_____
NOTARY PUBLIC
Print Name: _RICHARD J Heglin_
My commission expires: _1-31-202_

*(remainder of page left blank – Lender's signature page to follow)*

7

**LENDER:**

**CENTENNIAL BANK**
An Arkansas banking corporation


By: _Karen B. Roth_
Karen Roth, Vice President


STATE OF FLORIDA
COUNTY OF BROWARD


     I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before by Karen Roth, as Vice President of Centennial Bank, an Arkansas banking corporation, who does freely and voluntarily under authority duly vested in her by said company. She is: _____ either personally known to me or _____ has produced _FLORIDA DRIVER LICENSE_ as identification.

     WITNESS by hand and official seal in the County and State last aforesaid this _21_ day of March 2019.


RICHARD J HEGLIN
Notary Public - State of Florida
Commission # GG 067183
My Comm. Expires Jan 31, 2021

_Richard J. Hegl_
NOTARY PUBLIC
Print Name: _RICHARD J Heglin_
My commission expires: _1 - 31 - 2021_


*(remainder of page left blank – Exhibit "A" to follow)*

8

**EXHIBIT "A"**

EXHIBIT "A" - LOAN AMORTIZATION SCHEDULE - FELIPE VAZQUEZ

*Note 1:  Scheduled Payment includes Principal plus Interest.*
*Note 2.  Repayment Amount includes Scheduled Payment plus Interest Reserve for the offseason during season*
*Note 3.  Total includes Repayment Amount plus Insurance Escrow and SureSports fees.*

| PMT NO | PAYMENT DATE | BEGINNING BALANCE | REPAYMENT AMOUNT | INTEREST RESERVE | SCHEDULED PAYMENT | PRINCIPAL | INTEREST | INSURANCE ESCROW | SURESPORTS FEE | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 5/1/2019 | $3,000,000.00 | $103,530.45 | $13,530.45 | $90,000.00 | $68,645.83 | $21,354.17 | $3,212.00 | $4,970.00 | $111,712.45 |
| 2 | 6/1/2019 | $2,931,354.17 | $103,530.45 | $13,530.45 | $90,000.00 | $74,223.61 | $15,776.39 | $3,212.00 | $4,970.00 | $111,712.45 |
| 3 | 7/1/2019 | $2,857,130.55 | $103,530.45 | $13,530.45 | $90,000.00 | $75,119.11 | $14,880.89 | $3,212.00 | $4,970.00 | $111,712.45 |
| 4 | 8/1/2019 | $2,782,011.44 | $103,530.45 | $13,530.45 | $90,000.00 | $75,027.37 | $14,972.63 | $3,212.00 | $4,970.00 | $111,712.45 |
| 5 | 9/1/2019 | $2,706,984.07 | $103,530.45 | $13,530.45 | $90,000.00 | $75,431.16 | $14,568.84 | $3,212.00 | $4,970.00 | $111,712.45 |
| 6 | 10/1/2019 | $2,631,552.91 | $103,530.45 | $13,530.45 | $90,000.00 | $76,294.00 | $13,706.00 | $3,212.00 | $4,970.00 | $111,712.45 |
| 7 | 11/1/2019 | $2,555,258.91 | $0.00 | $0.00 | $13,752.26 | $0.00 | $13,752.26 | $0.00 | $0.00 | $0.00 |
| 8 | 12/1/2019 | $2,555,258.91 | $0.00 | $0.00 | $13,308.64 | $0.00 | $13,308.64 | $0.00 | $0.00 | $0.00 |
| 9 | 1/1/2020 | $2,555,258.91 | $0.00 | $0.00 | $13,752.26 | $0.00 | $13,752.26 | $0.00 | $0.00 | $0.00 |
| 10 | 2/1/2020 | $2,555,258.91 | $0.00 | $0.00 | $13,752.26 | $0.00 | $13,752.26 | $0.00 | $0.00 | $0.00 |
| 11 | 3/1/2020 | $2,555,258.91 | $0.00 | $0.00 | $12,865.02 | $0.00 | $12,865.02 | $0.00 | $0.00 | $0.00 |
| 12 | 4/1/2020 | $2,555,258.91 | $0.00 | $0.00 | $13,752.26 | $0.00 | $13,752.26 | $0.00 | $0.00 | $0.00 |
| 13 | 5/1/2020 | $2,555,258.91 | $192,361.25 | $7,986.25 | $184,375.00 | $171,066.36 | $13,308.64 | $951.00 | $4,970.00 | $198,282.25 |
| 14 | 6/1/2020 | $2,384,192.55 | $192,361.25 | $7,986.25 | $184,375.00 | $171,543.41 | $12,831.59 | $951.00 | $4,970.00 | $198,282.25 |
| 15 | 7/1/2020 | $2,212,649.15 | $192,361.25 | $7,986.25 | $184,375.00 | $172,850.79 | $11,524.21 | $951.00 | $4,970.00 | $198,282.25 |
| 16 | 8/1/2020 | $2,039,798.36 | $192,361.25 | $7,986.25 | $184,375.00 | $173,396.92 | $10,978.08 | $951.00 | $4,970.00 | $198,282.25 |
| 17 | 9/1/2020 | $1,866,401.44 | $192,361.25 | $7,986.25 | $184,375.00 | $174,330.13 | $10,044.87 | $951.00 | $4,970.00 | $198,282.25 |
| 18 | 10/1/2020 | $1,692,071.31 | $192,361.25 | $7,986.25 | $184,375.00 | $175,562.13 | $8,812.87 | $951.00 | $4,970.00 | $198,282.25 |
| 19 | 11/1/2020 | $1,516,509.18 | $0.00 | $0.00 | $8,161.77 | $0.00 | $8,161.77 | $0.00 | $0.00 | $0.00 |
| 20 | 12/1/2020 | $1,516,509.18 | $0.00 | $0.00 | $7,898.49 | $0.00 | $7,898.49 | $0.00 | $0.00 | $0.00 |
| 21 | 1/1/2021 | $1,516,509.18 | $0.00 | $0.00 | $8,161.77 | $0.00 | $8,161.77 | $0.00 | $0.00 | $0.00 |
| 22 | 2/1/2021 | $1,516,509.18 | $0.00 | $0.00 | $8,161.77 | $0.00 | $8,161.77 | $0.00 | $0.00 | $0.00 |
| 23 | 3/1/2021 | $1,516,509.18 | $0.00 | $0.00 | $7,371.92 | $0.00 | $7,371.92 | $0.00 | $0.00 | $0.00 |
| 24 | 4/1/2021 | $1,516,509.18 | $0.00 | $0.00 | $8,161.77 | $0.00 | $8,161.77 | $0.00 | $0.00 | $0.00 |
| 25 | 5/1/2021 | $1,516,509.18 | $257,455.00 | $0.00 | $257,455.00 | $249,556.51 | $7,898.49 | $0.00 | $4,970.00 | $262,425.00 |
| 26 | 6/1/2021 | $1,266,952.67 | $257,455.00 | $0.00 | $257,455.00 | $250,636.33 | $6,818.67 | $0.00 | $4,970.00 | $262,425.00 |
| 27 | 7/1/2021 | $1,016,316.34 | $257,455.00 | $0.00 | $257,455.00 | $252,161.69 | $5,293.31 | $0.00 | $4,970.00 | $262,425.00 |
| 28 | 8/1/2021 | $764,154.65 | $257,455.00 | $0.00 | $257,455.00 | $253,342.36 | $4,112.64 | $0.00 | $4,970.00 | $262,425.00 |
| 29 | 9/1/2021 | $510,812.29 | $257,455.00 | $0.00 | $257,455.00 | $254,705.84 | $2,749.16 | $0.00 | $4,970.00 | $262,425.00 |
| 30 | 10/1/2021 | $256,106.45 | $257,455.00 | $0.00 | $257,455.00 | $256,121.11 | $1,333.89 | $0.00 | $4,970.00 | $262,425.00 |

T.V

# EXHIBIT "D"

## FLORIDA AGREEMENT TO WAIVE GARNISHMENT PROTECTION
Loan Number ████ 5755

**IF YOU PROVIDE MORE THAN ONE-HALF OF THE SUPPORT FOR A CHILD OR OTHER DEPENDENT, ALL OR PART OF YOUR INCOME IS EXEMPT FROM GARNISHMENT UNDER FLORIDA LAW.  YOU CAN WAIVE THIS PROTECTION ONLY BY SIGNING THIS DOCUMENT.  BY SIGNING BELOW, YOU AGREE TO WAIVE THE PROTECTION FROM GARNISHMENT.**

Borrower:

_____                    3/21/19
Felipe Vazquez, an individual                        Date


I have fully explained this document to the consumer.

Lender:

**Centennial Bank**


By _____                  3/25/19
Authorized Signor                                    Date

F.V

# EXHIBIT "E"

# ANTHONY & PARTNERS
## ATTORNEYS AT LAW

100 S. ASHLEY DRIVE
SUITE 1600
TAMPA, FL 33602
DIRECT: 813-273-5616
FAX: 813-221-4113
ANTHONYANDPARTNERS.COM

JANTHONY@ANTHONYANDPARTNERS.COM
813-273-5066

November 23, 2020

**VIA FEDEX**

Felipe Vazquez, Offender ID 36879
Booking No. 3519-2019
Westmoreland County Prison
3000 S. Grande Boulevard
Greensburg, Pennsylvania 15601

**VIA FEDEX**

Felipe Vazquez



**VIA FEDEX**

Felipe Vazquez



**VIA FEDEX**

Felipe Vazquez
c/o The Law Offices of Gary E. Gerson
Attn: Gary E. Gerson, Esquire
304 Ross Street, #600
Pittsburgh, Pennsylvania 15219

Re:   **Centennial Bank vs. Felipe Vazquez**
      **Middle District of Florida, Orlando Division**
      **Case No.:  TBA (the "Collection Action")**

Dear Mr. Vazquez:

The lending relationship referenced above has been referred to the undersigned for collection by Centennial Bank ("Centennial"), as against you as borrower in the above-referenced Collection Action that will be initiated against you in five (5) days in the event that the debt at issue (the "Loan") is not repaid by that date. This demand letter is intended to provide you with notice of default on the Loan, and this matter requires immediate attention in order to avoid the onset of loan enforcement litigation.

Because the lending relationship between Centennial and you is now in default, some background regarding the situation is appropriate. The history leading up to the present default situation is as follows:

1.      On January 16, 2018, you entered into a "Major League Uniform's Contract" (the "Player's Contract") with Pittsburgh Associates (the "Team"), pursuant to which you were to be compensated $19,000,000 over a four (4) year term extending from 2018 through 2021, subject to terms and conditions more fully described therein. A copy of the Player's Contract is provided as Enclosure "A."

**ANTHONY & PARTNERS, LLC**

Felipe Vazquez, f/k/n
Felipe Javier Rivero
November 23, 2020
Page 2

2.     Sure Sports, LLC (the "Broker") and you approached Centennial during March of 2019 for purposes of beginning a lending relationship. The relationship between you and the Broker is evidenced by a "Fee Agreement" (the "Fee Agreement"), containing terms and conditions for the Broker's efforts in providing underwriting and other services more fully described therein. A copy of the Fee Agreement is provided as Enclosure "B."

3.     Centennial approved you for a loan in the amount of $3,000,000 (the "Loan"). The Loan is evidenced by a "Promissory Note" (the "Note"), in the original principal amount of $3,000,000, with a maturity date of October 1, 2021. A copy of the Note is provided as Enclosure "C."

4.     As agreed between Centennial and you, the Loan was secured by your pledge of the rights under the Player's Contract. Centennial's in rem rights are evidenced by a "Secured Financial Transaction and Security Agreement" (the "Security Agreement"). A copy of the Security Agreement is provided as Enclosure "D."

5.     Consistent with the terms of the Note and Security Agreement, you executed a "Florida Agreement to Waive Garnishment Protection" (the "Garnishment Waiver") in favor of Centennial. A copy of the Garnishment Waiver is provided as Enclosure "E."

6.     Also, consistent with the terms of the Note and Security Agreement, you executed a "Cooperation Agreement" (the "Cooperation Agreement") with Centennial, agreeing to take all measures necessary to ensure performance of the lending relationship. A copy of the Cooperation Agreement is provided as Enclosure "F."

7.     As a final material aspect of the lending relationship, Centennial, the Broker, and you caused Lloyd's of London (the "Insurer") to issue a "Death, Disablement, and Disgrace" insurance policy (the "Policy"), to enhance the credit situation associated with the Loan, as evidenced by copies of the policy proposal documents received at the time, copies of which are provided as Enclosure "G."

8.     The Policy insures with respect to any one of a number of events that might shorten your career or terminate the Player's Contract. Of particular relevance is the provision relating to "disgrace." Within the Policy, the term "disgrace" is contractually defined as follows:

> Disgrace means (i) any criminal act, (ii) any offense or moral turpitude and/or against public taste or decency, or (iii) any situation or occurrence directly involving the Insured, which results in Termination or the Insure being suspended and not paid by the MLB League / Association for more than 45% of the Insured's Contract for the Year relating to 2019 Regular Season.

**ANTHONY & PARTNERS, LLC**

Felipe Vazquez, f/k/n
Felipe Javier Rivero
November 23, 2020
Page 3

It is significant that the three (3) alternative definitions for "disgrace" under the Policy are disjunctive and not conjunctive. Insurance coverage under this section of the Policy is capped at $3,000,000.

9.      You have been charged with at least three (3) violent sexual assault offenses in the Commonwealth of Pennsylvania, as follows:

    a.  <u>Commonwealth of Pennsylvania vs. Felipe Vazquez</u>, Docket Number CP-65-MD-0000770-2019, a copy of the current docket being provided as Enclosure "H."

    b.  <u>Commonwealth of Pennsylvania vs. Felipe Vazquez</u>, Docket Number CP-65-CR-0005098-2019, a copy of the current docket being provided as Enclosure "I."

    c.  <u>Commonwealth of Pennsylvania vs. Felipe Vazquez</u>, Docket Number CP-65-CR-0005102-2019, a copy of the current docket being provided as Enclosure "J."

    The allegations in all three (3) cases (the "Pennsylvania Criminal Cases") involve circumstances that clearly fall well within the definition of "disgrace." Moreover, other similar disgraceful charges are also pending against you in Florida and Missouri. Whether or not you have been or will be convicted, Centennial has a right to demand payment on the Policy, to the current amount of the Loan; however, the fact that demand has been made in no way absolves you of direct liability for the Loan.

10.     On April 1, 2020, you defaulted under the terms and conditions of the Note by failing to make the payment then due and owing. No payments have been made since the date of default. One would assume that the basis for default relates to the business relationship between you and the Team; however, that is not directly relevant or dispositive of the subject matter of this demand letter.

11.     Under the Note, Security Agreement, Garnishment Waiver, and Cooperation Agreement (collectively, the "Loan Documents"), you additionally have an obligation to comply with requirements that payments due under the Player's Contract from the Team to you be advanced to Centennial on account of the Loan. You have not done so, even though it appears that you may well have anticipated the current default situation before any payments from the Team were impacted by your above-described circumstances. Once again, the extent to which Centennial is able to recover from the Team does not absolve you of direct liability from the Loan.

12.     Centennial's current records reflect that the principal amount of the Loan is $2,552,646.82, together with interest at the non-default interest rate of 6.25% amounting to $113,894.14, and late fees in the amount of $57,316.98, for a total of $2,723,857.94, together with interest accruing after November 13, 2020. The non-default <u>per diem</u> is $443.17, to be added to final payoff pursuant to this demand letter

ANTHONY & PARTNERS, LLC

Felipe Vazquez, f/k/n
Felipe Javier Rivero
November 23, 2020
Page 4

(the "Payoff Demand Amount").  To confirm all of the foregoing, a copy of Centennial's computerized loan history for the Loan is provided as Enclosure "K." However, I hasten to mention that the Note is expressly governed pursuant to <u>Florida Statutes</u> §687.071 and related law that limits the highest rate allowed by law to 25% simple interest based upon a 365-day year.  Centennial expressly reserves the right to seek default-rate interest rather than contract-rate interest except as expressly provided below.

With all of the foregoing having been noted, this demand letter seeks demand of the Payoff Demand Amount, as defined above, within five (5) days from the date of this letter.  Although the interest calculation set forth above is reflected at the non-default interest rate, Centennial is expressly reserving the right to seek default-rate interest from the referenced default date, except as expressly set forth in this demand letter, because the <u>per diem</u> utilized above will only be applicable for purposes of timely satisfying the Loan pursuant to this demand.  Similarly, Centennial has a contractual right to recover late fees accruing pursuant to the terms of the Loan Documents, and all such rights are reserved to the extent not expressly waived.  Finally, attorneys' fees and court costs are recoverable pursuant to the Loan Documents as a component of the Loan, and these claim components continue to augment while the lending relationship requires the attention of counsel.

Your payment should be delivered to T. Doug Green, Special Assets Division, Centennial Bank, 26417 US Hwy 19 N., Clearwater, Florida 33761, within five (5) days from the date of this demand letter.  Payment should be by cashiers' check, certified funds, or money order.  Alternatively, wire instructions are available upon request.  Before making a payment, please contact my office if you would like confirmation as to pay-off amounts.  For purposes of this demand, payment by you must include the applicable additional stated increment based upon the <u>per diem</u> set forth above.

Centennial reserves the right to initiate litigation (in any court of competent jurisdiction) if it determines that this is appropriate, prior to the expiration of the five (5) day notice period set forth herein; however, any such litigation will be dismissed in the event that payment in full is timely received.  Centennial possesses third-party and <u>in rem</u> rights to secure the Loan.  Centennial also possesses <u>in personam</u> rights against you.

Should Centennial receive a partial payment from you, such payment will be applied in a manner permitted under the Loan Documents, at the discretion of Centennial.  Under such circumstances, such payment and the resulting credit will not alter the status of the lending relationship as fully accelerated and demanded.  Centennial expressly reserves the right to seek compensation and reimbursement for prospective default rate interest, collection charges, attorneys' fees, and related costs that may be incurred as a result of continuing defaults.  Any questions or comments regarding the current <u>per diem</u> computation, or other claim components, can be directed to the undersigned.

Prospectively, Centennial and you may discuss potential alternatives for consensually resolving this problem loan relationship without the sacrifice of the full range of rights and remedies available to Centennial.  Any proposal or concept previously discussed by Centennial is hereby declared null, void, withdrawn, and superseded by this demand.  Notwithstanding the same, and

ANTHONY & PARTNERS, LLC

Felipe Vazquez, f/k/n
Felipe Javier Rivero
November 23, 2020
Page 5

consistent with <u>Florida Statutes</u> §90.408 and Federal Rule of Evidence 408, confidential settlement negotiations may hereafter occur regarding this problem lending relationship. If so, these negotiations will not be admissible to vary or modify the legal import of the demand set forth above. Additionally, and pursuant to <u>Florida Statutes</u> §687.0304, no conduct or communication of Centennial will be construed as a waiver, release, or other modification of the full range of options that Centennial enjoys under applicable law at this time. Recognizing that all of these statutes are consistent with the express provisions of the Loan Documents, I do not anticipate that the reservation of rights restated herein comes as a surprise in any respect.

We trust that you will give this matter their prompt attention so that the time, expense, and energy associated with litigation can be allocated by all parties toward more productive endeavors. In closing, I would ask that you, and your counsel if you retain counsel, refrain from contacting Centennial directly from now on. As a courtesy, I am providing notice of this demand to the only lawyer who we know to represent you, Gary E. Gerson, Esquire, who is apparently involved in your criminal defense. I hope and anticipate that Mr. Gerson and his colleagues will advise you regarding these matters; however, notice of default is beneficial to all involved at this juncture, as is opportunity to cure.

Very truly yours,

John A. Anthony

JAA/eu
Enclosures

cc:   Centennial Bank
      Gary E. Gerson, Esquire